## CAREY, GOVERNOR OF NEW YORK, ET AL. v. POPULATION SERVICES INTERNATIONAL ET AL.

No. 75–443.   Argued January 10, 1977—Decided June 9, 1977

Arlene R. Silverman, Assistant Attorney General of New York, argued the cause for appellants. With her on the briefs were Louis J. Lefkowitz, Attorney General, and Samuel A. Hirshowitz, First Assistant Attorney General.

Michael N. Pollet argued the cause for appellees. With him on the brief was Steven Delibert.*

---

*Briefs of amici curiae urging affirmance were filed by Melvin L. Wulf,

Mr. Justice Brennan delivered the opinion of the Court (Parts I, II, III, and V), together with an opinion (Part IV), in which Mr. Justice Stewart, Mr. Justice Marshall, and Mr. Justice Blackmun joined.

Under New York Educ. Law § 6811 (8) (McKinney 1972) it is a crime (1) for any person to sell or distribute any contraceptive of any kind to a minor under the age of 16 years; (2) for anyone other than a licensed pharmacist to distribute contraceptives to persons 16 or over; and (3) for anyone, including licensed pharmacists, to advertise or display contraceptives.[1] A three-judge District Court for the Southern District of New York declared § 6811 (8) unconstitutional in its entirety under the First and Fourteenth Amendments of the

---

*Judith M. Mears,* and *Rena Uviller* for the American Civil Liberties Union; and by *Harriet F. Pilpel* and *Eve W. Paul* for the Planned Parenthood Federation of America et al.

[1] Section 6811 (8) provides:
"It shall ·be a class A misdemeanor for:

.            .              .           .

"8. Any person to sell or distribute any instrument or article, or any recipe, drug or medicine for the prevention of contraception to a minor under the age of sixteen years; the sale or distribution of such to a person other than a minor under the age of sixteen years is authorized only by a licensed pharmacist but the advertisement or display of said articles, within or without the premises of such pharmacy, is hereby prohibited."

After some dispute in the District Court the parties apparently now agree that Education Law § 6807 (b) (McKinney 1972) constitutes an exception to the distribution prohibitions of § 6811 (8). Section 6807 (b) provides:
"This article shall not be construed to affect or prevent:

.            .              .           .

"(b) Any physician . . . who is not the owner of a pharmacy, or registered store, or who is not in the employ of such owner, from supplying his patients with such drugs as the physician . . . deems proper in connection with his practice . . . ."

The definition of "drugs" in Education Law § 6802 (7) (McKinney 1972) apparently includes any contraceptive drug or device. See nn. 7, 13, and 23, and text, *infra,* at 697–699. See also 398 F. Supp. 321, 329–330, and n. 8.

Federal Constitution insofar as it applies to nonprescription contraceptives, and enjoined its enforcement as so applied. 398 F. Supp. 321 (1975). We noted probable jurisdiction, 426 U. S. 918 (1976). We affirm.

## I

We must address a preliminary question of the standing of the various appellees to maintain the action. We conclude that appellee Population Planning Associates, Inc. (PPA) has the requisite standing and therefore have no occasion to decide the standing of the other appellees.[2]

PPA is a corporation primarily engaged in the mail-order retail sale of nonmedical contraceptive devices from its offices in North Carolina. PPA regularly advertises its products in periodicals published or circulated in New York, accepts orders from New York residents, and fills orders by mailing contraceptives to New York purchasers. Neither the advertisements nor the order forms accompanying them limit availability of PPA's products to persons of any particular age.

Various New York officials have advised PPA that its activities violate New York law. A letter of December 1, 1971, notified PPA that a PPA advertisement in a New York college newspaper violated § 6811 (8), citing each of the three challenged provisions, and requested "future compliance" with the

---

[2] In addition to PPA, the plaintiffs in the District Court, appellees here, are Population Services International, a nonprofit corporation disseminating birth control information and services; Rev. James B. Hagen, a minister and director of a venereal disease prevention program that distributes contraceptive devices; three physicians specializing in family planning, pediatrics, and obstetrics-gynecology; and an adult New York resident who alleges that the statute inhibits his access to contraceptive devices and information, and his freedom to distribute the same to his minor children. The District Court held that PPA and Hagen had standing, and therefore found it unnecessary to decide the standing of the other plaintiffs. *Id.*, at 327–330.

The appellants here, defendants in the District Court, are state officials responsible for the enforcement of the Education Law provisions.

law. A second letter, dated February 23, 1973, notifying PPA that PPA's magazine advertisements of contraceptives violated the statute, referred particularly to the provisions prohibiting sales to minors and sales by nonpharmacists, and threatened: "In the event you fail to comply, the matter will be referred to our Attorney General for legal action." Finally, PPA was served with a copy of a report of inspectors of the State Board of Pharmacy, dated September 4, 1974, which recorded that PPA advertised male contraceptives, and had been advised to cease selling contraceptives in violation of the state law.

That PPA has standing to challenge § 6811 (8), not only in its own right but also on behalf of its potential customers, is settled by *Craig* v. *Boren,* 429 U. S. 190, 192–197 (1976). *Craig* held that a vendor of 3.2% beer had standing to challenge in its own right and as advocate for the rights of third persons, the gender-based discrimination in a state statute that prohibited sale of the beer to men, but not to women, between the ages of 18 and 21. In this case, as did the statute in *Craig,* § 6811 (8) inflicts on the vendor PPA "injury in fact" that satisfies Art. III's case-or-controversy requirement, since "[t]he legal duties created by the statutory sections under challenge are addressed directly to vendors such as [PPA. It] is obliged either to heed the statutory [prohibition], thereby incurring a direct economic injury through the constriction of [its] market, or to disobey the statutory command and suffer" legal sanctions. 429 U. S., at 194.[3] There-

---

[3] Appellants contend that PPA has not suffered "injury in fact" because it has not shown that prosecution under § 6811 (8) is imminent. *Steffel* v. *Thompson,* 415 U. S. 452, 459–460 (1974) is dispositive of this argument. PPA alleges that it has violated the challenged statute in the past, and continues to violate it in the regular course of its business; that it has been advised by the authorities responsible for enforcing the statute that it is in violation; and that on at least one occasion, it has been threatened with prosecution. The threat is not, as in *Poe* v. *Ullman,* 367 U. S. 497, 508 (1961) (plurality opinion), "chimerical." In that

fore, PPA is among the "vendors and those in like positions [who] have been uniformly permitted to resist efforts at restricting their operations by acting as advocates for the rights of third parties who seek access to their market or function." *Id.*, at 195. See also *Eisenstadt* v. *Baird,* 405 U. S. 438, 443–446 (1972); *Sullivan* v. *Little Hunting Park,* 396 U. S. 229, 237 (1969); *Barrows* v. *Jackson,* 346 U. S. 249, 257–260 (1953). As such, PPA "is entitled to assert those concomitant rights of third parties that would be 'diluted or adversely affected' should [its] constitutional challenge fail." *Craig* v. *Boren, supra,* at 195, quoting *Griswold* v. *Connecticut,* 381 U. S. 479, 481 (1965).[4]

## II

Although "[t]he Constitution does not explicitly mention any right of privacy," the Court has recognized that one aspect of the "liberty" protected by the Due Process Clause of the Fourteenth Amendment is "a right of personal privacy, or a guarantee of certain areas or zones of privacy." *Roe* v. *Wade,* 410 U. S. 113, 152 (1973). This right of personal privacy includes "the interest in independence in making certain kinds of important decisions." *Whalen* v. *Roe,* 429 U. S. 589, 599–600 (1977). While the outer limits of this aspect of privacy have not been marked by the Court, it is clear that among

---

case, the challenged state law had fallen into virtual desuetude through lack of prosecution over some 80 years, and plaintiffs alleged no explicit threat of prosecution. Here, PPA has been threatened with legal action, and prosecutions have been brought under the predecessor of § 6811 (8) as recently as 1965. See, *e. g., People* v. *Baird,* 47 Misc. 2d 478, 262 N. Y. S. 2d 947 (1965).

[4] Indeed, the case for the vendor's standing to assert the rights of potential purchasers of his product is even more compelling here than in *Craig,* because the rights involved fall within the sensitive area of personal privacy. In such a case potential purchasers "may be chilled from . . . assertion [of their own rights] by a desire to protect the very privacy [they seek to vindicate] from the publicity of a court suit." *Singleton* v. *Wulff,* 428 U. S. 106, 117 (1976).

the decisions that an individual may make without unjustified government interference are personal decisions "relating to marriage, *Loving* v. *Virginia,* 388 U. S. 1, 12 (1967) ; procreation, *Skinner* v. *Oklahoma ex rel. Williamson,* 316 U. S. 535, 541–542 (1942) ; contraception, *Eisenstadt* v. *Baird,* 405 U. S., at 453–454; *id.,* at 460, 463–465 (WHITE, J., concurring in result) ; family relationships, *Prince* v. *Massachusetts,* 321 U. S. 158, 166 (1944) ; and child rearing and education, *Pierce* v. *Society of Sisters,* 268 U. S. 510, 535 (1925) ; *Meyer* v. *Nebraska,* [262 U. S. 390, 399 (1923)]." *Roe* v. *Wade, supra,* at 152–153. See also *Cleveland Board of Education* v. *LaFleur,* 414 U. S. 632, 639–640 (1974).

The decision whether or not to beget or bear a child is at the very heart of this cluster of constitutionally protected choices. That decision holds a particularly important place in the history of the right of privacy, a right first explicitly recognized in an opinion holding unconstitutional a statute prohibiting the use of contraceptives, *Griswold* v. *Connecticut, supra,* and most prominently vindicated in recent years in the contexts of contraception, *Griswold* v. *Connecticut, supra; Eisenstadt* v. *Baird, supra;* and abortion, *Roe* v. *Wade, supra; Doe* v. *Bolton,* 410 U. S. 179 (1973) ; *Planned Parenthood of Central Missouri* v. *Danforth,* 428 U. S. 52 (1976). This is understandable, for in a field that by definition concerns the most intimate of human activities and relationships, decisions whether to accomplish or to prevent conception are among the most private and sensitive. "If the right of privacy means anything, it is the right of the individual, married or single, to be free of unwarranted governmental intrusion into matters so fundamentally affecting a person as the decision whether to bear or beget a child." *Eisenstadt* v. *Baird, supra,* at 453. (Emphasis omitted.)

That the constitutionally protected right of privacy extends to an individual's liberty to make choices regarding contraception does not, however, automatically invalidate every state

regulation in this area. The business of manufacturing and selling contraceptives may be regulated in ways that do not infringe protected individual choices. And even a burdensome regulation may be validated by a sufficiently compelling state interest. In *Roe* v. *Wade,* for example, after determining that the "right of privacy . . . encompass[es] a woman's decision whether or not to terminate her pregnancy," 410 U. S., at 153, we cautioned that the right is not absolute, and that certain state interests (in that case, "interests in safeguarding health, in maintaining medical standards, and in protecting potential life") may at some point "become sufficiently compelling to sustain regulation of the factors that govern the abortion decision." *Id.,* at 154. "Compelling" is of course the key word; where a decision as fundamental as that whether to bear or beget a child is involved, regulations imposing a burden on it may be justified only by compelling state interests, and must be narrowly drawn to express only those interests. *Id.,* at 155–156, and cases there cited.

With these principles in mind, we turn to the question whether the District Court was correct in holding invalid the provisions of § 6811 (8) as applied to the distribution of nonprescription contraceptives.

## III

We consider first the wider restriction on access to contraceptives created by § 6811 (8)'s prohibition of the distribution of nonmedical contraceptives to adults except through licensed pharmacists.

Appellants argue that this Court has not accorded a "right of access to contraceptives" the status of a fundamental aspect of personal liberty. They emphasize that *Griswold* v. *Connecticut* struck down a state prohibition of the *use* of contraceptives, and so had no occasion to discuss laws "regulating their manufacture or sale." 381 U. S., at 485. *Eisenstadt* v. *Baird,* was decided under the Equal Protection Clause, holding that "whatever the rights of the individual to access to contra-

ceptives may be, the rights must be the same for the unmarried and the married alike." 405 U. S., at 453. Thus appellants argue that neither case should be treated as reflecting upon the State's power to limit or prohibit distribution of contraceptives to any persons, married or unmarried. But see *id.,* at 463–464 (WHITE, J., concurring in result).

The fatal fallacy in this argument is that it overlooks the underlying premise of those decisions that the Constitution protects "the right of the individual . . . to be free from unwarranted governmental intrusion into . . . the decision whether to bear or beget a child." *Id.,* at 453. *Griswold* did state that by "forbidding the *use* of contraceptives rather than regulating their manufacture or sale," the Connecticut statute there had "a maximum destructive impact" on privacy rights. 381 U. S., at 485. This intrusion into "the sacred precincts of marital bedrooms" made that statute particularly "repulsive." *Id.,* at 485–486. But subsequent decisions have made clear that the constitutional protection of individual autonomy in matters of childbearing is not dependent on that element. *Eisenstadt* v. *Baird,* holding that the protection is not limited to married couples, characterized the protected right as the *"decision* whether to bear or beget a child." 405 U. S., at 453 (emphasis added). Similarly, *Roe* v. *Wade,* held that the Constitution protects "a woman's *decision* whether or not to terminate her pregnancy." 410 U. S., at 153 (emphasis added). See also *Whalen* v. *Roe, supra,* at 599–600, and n. 26. These decisions put *Griswold* in proper perspective. *Griswold* may no longer be read as holding only that a State may not prohibit a married couple's use of contraceptives. Read in light of its progeny, the teaching of *Griswold* is that the Constitution protects individual decisions in matters of childbearing from unjustified intrusion by the State.

Restrictions on the distribution of contraceptives clearly burden the freedom to make such decisions. A total prohibition against sale of contraceptives, for example, would intrude

upon individual decisions in matters of procreation and contraception as harshly as a direct ban on their use. Indeed, in practice, a prohibition against all sales, since more easily and less offensively enforced, might have an even more devastating effect upon the freedom to choose contraception. Cf. *Poe* v. *Ullman,* 367 U. S. 497 (1961).

An instructive analogy is found in decisions after *Roe* v. *Wade, supra,* that held unconstitutional statutes that did not prohibit abortions outright but limited in a variety of ways a woman's access to them. *Doe* v. *Bolton,* 410 U. S. 179 (1973); *Planned Parenthood of Central Missouri* v. *Danforth,* 428 U. S. 52 (1976). See also *Bigelow* v. *Virginia,* 421 U. S. 809 (1975). The significance of these cases is that they establish that the same test must be applied to state regulations that burden an individual's right to decide to prevent conception or terminate pregnancy by substantially limiting access to the means of effectuating that decision as is applied to state statutes that prohibit the decision entirely. Both types of regulation "may be justified only by a 'compelling state interest'. . . and . . . must be narrowly drawn to express only the legitimate state interests at stake." *Roe* v. *Wade, supra,* at 155.[5] See also *Eisenstadt* v. *Baird,* 405 U. S., at 463 (WHITE, J., concurring in result). This is so not because there is an independent fundamental "right of access to contraceptives," but because such access is essential to exercise of the constitutionally protected right of decision in matters of childbearing that is the

---

[5] Contrary to the suggestion advanced in MR. JUSTICE POWELL's opinion, we do not hold that state regulation must meet this standard "whenever it implicates sexual freedom," *post,* at 705, or "affect[s] adult sexual relations," *post,* at 703, but only when it "burden[s] an individual's right to decide to prevent conception or terminate pregnancy by substantially limiting access to the means of effectuating that decision." *Supra,* this page. As we observe below, "the Court has not definitively answered the difficult question whether and to what extent the Constitution prohibits state statutes regulating [private consensual sexual] behavior among adults," n. 17, *infra,* and we do not purport to answer that question now.

underlying foundation of the holdings in *Griswold, Eisenstadt* v. *Baird,* and *Roe* v. *Wade.*

Limiting the distribution of nonprescription contraceptives to licensed pharmacists clearly imposes a significant burden on the right of the individuals to use contraceptives if they choose to do so. *Eisenstadt* v. *Baird, supra,* at 461–464 (WHITE, J., concurring in result). The burden is, of course, not as great as that under a total ban on distribution. Nevertheless, the restriction of distribution channels to a small fraction of the total number of possible retail outlets renders contraceptive devices considerably less accessible to the public, reduces the opportunity for privacy of selection and purchase,[6] and lessens the possibility of price competition.[7] Cf. *Griswold* v. *Connecticut,* 381 U. S., at 503 (WHITE, J., concurring in judgment). Of particular relevance here is *Doe* v. *Bolton, supra,* in which the Court struck down, as unconstitutionally burdening the right of a woman to choose abortion, a statute requiring that abortions be performed only in accredited hospitals, in the absence of proof that the requirement was substantially related to the State's interest in protecting the patient's health. 410 U. S., at 193–195. The same infirmity infuses the limitation in § 6811 (8). "Just as in *Griswold,* where the right of married persons to use contraceptives was 'diluted or adversely affected' by permitting a

---

[6] As MR. JUSTICE POWELL notes, *post,* at 711, the prohibition of mail-order sales of contraceptives, as practiced by PPA, is a particularly "significant invasion of the constitutionally protected privacy in decisions concerning sexual relations."

[7] The narrow exception to § 6811 (8) arguably provided by New York Educ. Law § 6807 (b) (McKinney, Supp. 1976–1977), see n. 1, *supra,* which permits a physician "who is not the owner of a pharmacy, or registered store" to supply his patients with "such drugs as [he] . . . deems proper in connection with his practice" obviously does not significantly expand the number of regularly available, easily accessible retail outlets for nonprescription contraceptives, and so has little relevance to our analysis of this aspect of § 6811 (8).

conviction for giving advice as to its exercise, . . . so here, to sanction a medical restriction upon distribution of a contraceptive not proved hazardous to health would impair the exercise of the constitutional right." *Eisenstadt* v. *Baird,* 405 U. S., at 464 (WHITE, J., concurring in result).

There remains the inquiry whether the provision serves a compelling state interest. Clearly "interests . . . in maintaining medical standards, and in protecting potential life," *Roe* v. *Wade,* 410 U. S., at 154, cannot be invoked to justify this statute. Insofar as § 6811 (8) applies to nonhazardous contraceptives,[8] it bears no relation to the State's interest in protecting health. *Eisenstadt* v. *Baird, supra,* at 450–452; 463–464 (WHITE, J., concurring in result).[9] Nor is the interest in protecting potential life implicated in state regulation of contraceptives. *Roe* v. *Wade, supra,* at 163–164.

Appellants therefore suggest that § 6811 (8) furthers other state interests. But none of them is comparable to those the Court has heretofore recognized as compelling. Appellants argue that the limitation of retail sales of nonmedical contraceptives to pharmacists (1) expresses "a proper concern that young people not sell contraceptives"; (2) "allows purchasers to inquire as to the relative qualities of the varying products and prevents anyone from tampering with them"; and (3) facilitates enforcement of the other provisions of the statute. Brief for Appellants 14. The first hardly can justify the statute's incursion into constitutionally protected rights, and

---

[8] We have taken judicial notice that "not all contraceptives are potentially dangerous." *Eisenstadt* v. *Baird,* 405 U. S., 438, 451, and n. 9 (1972). See also *id.,* at 463–464 (WHITE, J., concurring in result).

[9] Indeed, in light of other provisions of both federal and state law that comprehensively regulate hazardous drugs and devices, see, *e. g.,* 21 U. S. C. §§ 351–360, especially § 353 (b); N. Y. Educ. Law §§ 6800–6826 (McKinney 1972 and Supp. 1976–1977), especially § 6810, it is unclear what health-related interest the State could have in nonprescription contraceptives. *Eisenstadt* v. *Baird, supra,* at 452.

in any event the statute is obviously not substantially related to any goal of preventing young people from selling contraceptives.[10] Nor is the statute designed to serve as a quality control device. Nothing in the record suggests that pharmacists are particularly qualified to give advice on the merits of different nonmedical contraceptives, or that such advice is more necessary to the purchaser of contraceptive products than to consumers of other nonprescription items. Why pharmacists are better able or more inclined than other retailers to prevent tampering with prepackaged products, or, if they are, why contraceptives are singled out for this special protection, is also unexplained.[11] As to ease of enforcement, the prospect of additional administrative inconvenience has not been thought to justify invasion of fundamental constitutional rights. See, e. g., *Morrissey* v. *Brewer*, 408 U. S. 471 (1972); *Goldberg* v. *Kelly*, 397 U. S. 254 (1970).

## IV [12]

### A

The District Court also held unconstitutional, as applied to nonprescription contraceptives, the provision of § 6811 (8) prohibiting the distribution of contraceptives to those under

---

[10] Nothing in New York law limits the employment of minors who work as sales clerks in pharmacies. To the extent that minors employed in other retail stores selling contraceptive products might be exposed "to undesirable comments and gestures," Brief for Appellants 3–4, or otherwise corrupted by exposure to such products, minors working as sales clerks in pharmacies are exposed to the same hazards.

[11] As the District Court pointed out, while these interests are insufficient to justify limiting the distribution of nonhazardous contraceptives to pharmacists, other restrictions may well be reasonably related to the objective of quality control. We therefore express no opinion on, for example, restrictions on the distribution of contraceptives through vending machines, which are not before us in this case. See 398 F. Supp., at 336.

[12] This part of the opinion expresses the views of JUSTICES BRENNAN, STEWART, MARSHALL, and BLACKMUN.

16 years of age.[13] Appellants contend that this provision of the statute is constitutionally permissible as a regulation of the morality of minors, in furtherance of the State's policy against promiscuous sexual intercourse among the young.

The question of the extent of state power to regulate conduct of minors not constitutionally regulable when committed by adults is a vexing one, perhaps not susceptible of precise answer. We have been reluctant to attempt to define "the totality of the relationship of the juvenile and the state." *In re Gault,* 387 U. S. 1, 13 (1967). Certain principles, however, have been recognized. "Minors, as well as adults, are protected by the Constitution and possess constitutional rights." *Planned Parenthood of Central Missouri* v. *Danforth,* 428 U. S., at 74. "[W]hatever may be their precise impact, neither the Fourteenth Amendment nor the Bill of Rights is for adults alone." *In re Gault, supra,* at 13.[14] On the other hand, we have held in a variety of contexts that "the power of the state to control the conduct of children reaches beyond the scope of its authority over adults." *Prince* v. *Massachusetts,* 321 U. S. 158, 170 (1944). See *Ginsberg* v. *New York,* 390 U. S. 629 (1968). See also *McKeiver* v. *Pennsylvania,* 403 U. S. 528 (1971).

---

[13] Subject to an apparent exception for distribution by physicians in the course of their practice. See n. 1, *supra,* and *infra,* at 697–699, and n. 23.

[14] Thus minors are entitled to constitutional protection for freedom of speech, *Tinker* v. *Des Moines School Dist.,* 393 U. S. 503 (1969); *West Virginia Bd. of Education* v. *Barnette,* 319 U. S. 624 (1943); equal protection against racial discrimination, *Brown* v. *Board of Education,* 347 U. S. 483 (1954); due process in civil contexts, *Goss* v. *Lopez,* 419 U. S. 565 (1975); and a variety of rights of defendants in criminal proceedings, including the requirement of proof beyond a reasonable doubt, *In re Winship,* 397 U. S. 358 (1970), the prohibition of double jeopardy, *Breed* v. *Jones,* 421 U. S. 519 (1975), the rights to notice, counsel, confrontation, and cross-examination, and not to incriminate oneself, *In re Gault,* 387 U. S. 1 (1967), and the protection against coerced confessions, *Gallegos* v. *Colorado,* 370 U. S. 49 (1962); *Haley* v. *Ohio,* 332 U. S. 596 (1948).

Of particular significance to the decision of this case, the right to privacy in connection with decisions affecting procreation extends to minors as well as to adults. *Planned Parenthood of Central Missouri* v. *Danforth, supra,* held that a State "may not impose a blanket provision . . . requiring the consent of a parent or person *in loco parentis* as a condition for abortion of an unmarried minor during the first 12 weeks of her pregnancy." 428 U. S., at 74. As in the case of the spousal-consent requirement struck down in the same case, *id.,* at 67–72, "the State does not have the constitutional authority to give a third party an absolute, and possibly arbitrary, veto," *id.,* at 74, " 'which the state itself is absolutely and totally prohibited from exercising.' " *Id.,* at 69. State restrictions inhibiting privacy rights of minors are valid only if they serve "any significant state interest . . . that is not present in the case of an adult." *Id.,* at 75.[15] *Planned Parenthood* found that no such interest justified a state requirement of parental consent.[16]

---

[15] This test is apparently less rigorous than the "compelling state interest" test applied to restrictions on the privacy rights of adults. See, *e. g.,* n. 16, *infra.* Such lesser scrutiny is appropriate both because of the States' greater latitude to regulate the conduct of children, *Prince* v. *Massachusetts,* 321 U. S. 158 (1944); *Ginsberg* v. *New York,* 390 U. S. 629 (1968), and because the right of privacy implicated here is "the interest in independence in making certain kinds of important decisions," *Whalen* v. *Roe,* 429 U. S. 589, 599–600 (1977), and the law has generally regarded minors as having a lesser capability for making important decisions. See, *e. g., Planned Parenthood,* 428 U. S., at 102 (STEVENS, J., concurring in part and dissenting in part).

[16] *Planned Parenthood,* however, "does not suggest that every minor, regardless of age or maturity, may give effective consent for termination of her pregnancy. See *Bellotti* v. *Baird,* [428 U. S. 132 (1976)]. The fault of [the particular statute considered in *Planned Parenthood*] is that it imposes a special-consent provision, exercisable by a person other than the woman and her physician, as a prerequisite to a minor's termination of her pregnancy . . . without a sufficient justification for the restriction." *Id.,* at 75.

Since the State may not impose a blanket prohibition, or even a blanket requirement of parental consent, on the choice of a minor to terminate her pregnancy, the constitutionality of a blanket prohibition of the distribution of contraceptives to minors is *a fortiori* foreclosed. The State's interests in protection of the mental and physical health of the pregnant minor, and in protection of potential life are clearly more implicated by the abortion decision than by the decision to use a nonhazardous contraceptive.

Appellants argue, however, that significant state interests are served by restricting minors' access to contraceptives, because free availability to minors of contraceptives would lead to increased sexual activity among the young, in violation of the policy of New York to discourage such behavior.[17] The argument is that minors' sexual activity may be deterred by increasing the hazards attendant on it. The same argument, however, would support a ban on abortions for minors, or indeed support a prohibition on abortions, or access to contraceptives, for the unmarried, whose sexual activity is also against the public policy of many States. Yet, in each of these areas, the Court has rejected the argument, noting in *Roe* v. *Wade*, that "no court or commentator has taken the argument seriously." 410

---

[17] Appellees argue that the State's policy to discourage sexual activity of minors is itself unconstitutional, for the reason that the right to privacy comprehends a right of minors as well as adults to engage in private consensual sexual behavior. We observe that the Court has not definitively answered the difficult question whether and to what extent the Constitution prohibits state statutes regulating such behavior among adults. See generally Note, On Privacy: Constitutional Protection for Personal Liberty, 48 N. Y. U. L. Rev. 670, 719–738 (1973). But whatever the answer to that question, *Ginsberg* v. *New York, supra,* indicates that in the area of sexual mores, as in other areas, the scope of permissible state regulation is broader as to minors than as to adults. In any event, it is unnecessary to pass upon this contention of appellees, and our decision proceeds on the assumption that the Constitution does not bar state regulation of the sexual behavior of minors.

U. S., at 148. The reason for this unanimous rejection was stated in *Eisenstadt* v. *Baird:* "It would be plainly unreasonable to assume that [the State] has prescribed pregnancy and the birth of an unwanted child [or the physical and psychological dangers of an abortion] as punishment for fornication." 405 U. S., at 448. We remain reluctant to attribute any such "scheme of values" to the State.[18]

Moreover, there is substantial reason for doubt whether limiting access to contraceptives will in fact substantially discourage early sexual behavior. Appellants themselves conceded in the District Court that "there is no evidence that teenage extramarital sexual activity increases in proportion to the availability of contraceptives," 398 F. Supp., at 332, and n. 10, and accordingly offered none, in the District Court or here. Appellees, on the other hand, cite a considerable body of evidence and opinion indicating that there is no such deterrent effect.[19] Although we take judicial notice, as did the

---

[18] We note, moreover, that other provisions of New York law argue strongly against any conclusion that the deterrence of illegal sexual conduct among minors was an objective of § 6811 (8). First, a girl in New York may marry as young as 14, with the consent of her parents and a family court judge. N. Y. Dom. Rel. Law §§ 15-a, 15 (2), 15 (3) (McKinney 1964 and Supp. 1976–1977). Yet although sexual intercourse by a married woman of that age violates no state law, § 6811 (8) prohibits distribution of contraceptives to her. Second, New York requires that birth control information and services be provided to recipients of certain welfare programs, provided only that they are "of childbearing age, including children who can be considered sexually active." N. Y. Soc. Serv. Law § 350 (1) (e) (McKinney 1976); cf. 42 U. S. C. § 602 (a) (15) (A) (1970 ed., Supp. V). See also N. Y. Soc. Serv. Law § 365–a (3) (c) (McKinney 1976); cf. 42 U. S. C. § 1396d (a) (vii) (4) (C) (1970 ed., Supp. V). Although extramarital intercourse is presumably as contrary to state policy among minors covered by those programs as among others, state law requires distribution of contraceptives to them and prohibits their distribution to all others.

[19] See, *e. g.,* Settlage, Baroff, & Cooper, Sexual Experience of Younger Teenage Girls Seeking Contraceptive Assistance for the First Time, Family Planning Perspectives 223 (fall 1973); Pilpel & Wechsler, Birth Control,

District Court, *id.*, at 331–333, that with or without access to contraceptives, the incidence of sexual activity among minors is high,[20] and the consequences of such activity are frequently devastating,[21] the studies cited by appellees play no part in our decision. It is enough that we again confirm the principle that when a State, as here, burdens the exercise of a fundamental right, its attempt to justify that burden as a rational means for the accomplishment of some significant state policy requires more than a bare assertion, based on a conceded complete absence of supporting evidence, that the burden is connected to such a policy.[22]

Teenagers and the Law: A New Look 1971, Family Plannning Perspectives 37 (July 1971); Stein, Furnishing Information and Medical Treatment to Minors for Prevention, Termination and Treatment of Pregnancy, Clearinghouse Review 131, 132 (July 1971); Reiss, Contraceptive Information and Sexual Morality, Journal of Sex Research 51 (Apr. 1966). See also Note, Parental Consent Requirements and Privacy Rights of Minors: The Contraceptive Controversy, 88 Harv. L. Rev. 1001, 1010, and n. 67 (1975); Jordan, A Minor's Right to Contraceptives, 7 U. Calif. Davis L. Rev. 270, 272–273 (1974).

[20] See, *e. g.*, *id.*, at 271–273; Kanter & Zelnick, Sexual Experience of Young Unmarried Women in the United States, Family Planning Perspectives 9 (Oct. 1972).

[21] Although this is not the occasion for a full examination of these problems, the following data sketchily indicate their extent. According to New York City Department of Health statistics, filed with the Court by the American Civil Liberties Union as *amicus curiae*, in New York City alone there were over 6,000 live births to girls under the age of 17 in 1975, as well as nearly 11,000 abortions. Moreover, "[t]eenage motherhood involves a host of problems, including adverse physical and psychological effects upon the minor and her baby, the continuous stigma associated with unwed motherhood, the need to drop out of school with the accompanying impairment of educational opportunities, and other dislocations [including] forced marriage of immature couples and the often acute anxieties involved in deciding whether to secure an abortion." Note, Parental Consent Requirements and Privacy Rights of Minors: The Contraceptive Controversy, 88 Harv. L. Rev. 1001, 1010 (1975) (footnotes omitted). See also Jordan, *supra*, n. 19, at 273–275.

[22] Appellants argue that the statement in *Ginsberg* v. *New York*, 390

## B

Appellants argue that New York does not totally prohibit distribution of contraceptives to minors under 16, and that accordingly § 6811 (8) cannot be held unconstitutional. Although § 6811 (8) on its face is a flat unqualified prohibition, Educ. Law § 6807 (b) (McKinney, Supp. 1976–1977), see nn. 1, 7, and 13, *supra,* provides that nothing in Education Law §§ 6800–6826 shall be construed to prevent "[a]ny physician . . . from supplying his patients with such drugs as [he] . . . deems proper in connection with his practice." This narrow exception, however, does not save the statute. As we have held above as to limitations upon distribution to adults, less than total restrictions on access to contraceptives that significantly burden the right to decide whether to bear children must also pass constitutional scrutiny. Appellants assert no medical necessity for imposing a medical limitation on the distribution of nonprescription contraceptives to minors. Rather, they argue that such a restriction serves to emphasize to young people the seriousness with which the State views the decision to engage in sexual intercourse at an early age.[23] But this is only another form of the

---

U. S., at 641, that "it was not irrational for the legislature to find that exposure to material condemned by the statute is harmful to minors," is authority that the burden is appellees' to prove that there is no connection between the statute and the asserted state policy. But *Ginsberg* concerned a statute prohibiting dissemination of obscene material that it held was not constitutionally protected. In contrast § 6811 (8) concerns distribution of material access to which is essential to exercise of a fundamental right.

[23] There is considerable doubt that appellants accurately identify the legislative purposes in enacting Educ. Law §§ 6807 (b) and 6811 (8). Section 6811 (8) (formerly Educ. Law § 6804–b and before that Penal Law § 1142 (2)) was first enacted in 1965 as a modification, apparently in response to *Griswold* v. *Connecticut,* 381 U. S. 479 (1965), of former Penal Law § 1142, titled "Indecent articles." 1965 N. Y. Laws, c. 637. This statute, which dated back at least to § 318 of the Penal Code of

argument that juvenile sexual conduct will be deterred by making contraceptives more difficult to obtain. Moreover, that argument is particularly poorly suited to the restriction

1881, 1881 N. Y. Laws, c. 676, had made it a misdemeanor for any person to distribute or advertise "any instrument or article, or any drug or medicine, for the prevention of conception." Section 6807 (b), on the other hand, generally excepts the distribution of drugs by a physician in the course of his practice from all the licensing requirements and restrictions imposed on the practice of pharmacy by Education Law §§ 6800–6826 (subject to certain provisos not here relevant). Such a provision, in one form or another and bearing several different numbers, has been included in the article concerning the practice of pharmacy since that article was first incorporated in the Education Law in 1927, see former Education Law § 1361, 1927 N. Y. Laws, c. 85, and before that a similar provision was included in the statutes regulating pharmacy in the Public Health Law. See, e. g., Public Health Law of 1893, § 187, 1893 N. Y. Laws, c. 661. Thus, § 6807 (b) and its predecessors long predate the inclusion of § 6811 (8) in the Education Law.

Even more significantly, when § 6811 (8) was first enacted as Penal Law § 1142 (2), it was not subject to the physicians' exception of § 6807 (b). Rather, it was apparently subject to a different physicians' exception, former Penal Law § 1145 (§ 321 of the Penal Code of 1881), which provided:

"An article or instrument, used or applied by physicians lawfully practicing, or by their direction or prescription, for the cure or prevention of disease, is not an article of indecent or immoral nature or use, within this chapter. The supplying of such articles to such physicians or by their direction or prescription, is not an offense under this chapter."

This was interpreted by the New York Court of Appeals to permit a physician "in good faith" to use contraceptives to treat "a married person to cure or prevent disease," but not to permit "promiscuous advice to patients irrespective of their condition." People v. Sanger, 222 N. Y. 192, 194–195, 118 N. E. 637, 637–638 (1918), appeal dismissed for lack of jurisdiction, 251 U. S. 537 (1919) (per curiam). See also People v. Byrne, 99 Misc. 1, 163 N. Y. S. 682 (1917); People v. Baird, 47 Misc. 2d 478, 262 N. Y. S. 2d 947 (1965).

In light of this history, it appears that insofar as the legislature had § 6807 (b) in mind at all when it transferred the prohibition of distribu-

appellants are attempting to justify, which on appellants' construction delegates the State's authority to disapprove of minors' sexual behavior to physicians, who may exercise it arbitrarily,[24] either to deny contraceptives to young people, or to undermine the State's policy of discouraging illicit early sexual behavior. This the State may not do. Cf. *Planned Parenthood of Central Missouri* v. *Danforth,* 428 U. S., at 69, 74.[25]

---

tion of contraceptives to those under 16 from the Penal Law to the Education Law, it thought of that section as at most a narrow exception, analogous to § 1145, permitting physicians, "in connection with [their] practice," to treat or prevent disease, rather than, as appellants assert, intending that §§ 6807 (b) and 6811 (8) be read together as establishing a scheme under which contraceptives would be freely available to those under 16, but limiting the distribution function to physicians. The legislative history of attempts in 1972 and 1974 to modify § 6811 (8), to which appellants refer, supports this construction. The legislators debating those bills seem to have thought of § 6811 (8) as a flat prohibition of the distribution of contraceptives to minors, and made no reference to § 6807 (b).

[24] In *Doe* v. *Bolton,* 410 U. S. 179, 196 (1973), we doubted that physicians would allow their moral "predilections on extramarital sex" to interfere with their medical judgments concerning abortions. Here, however, no *medical* judgment is involved at all; the State purports to commission physicians to engage in *moral* counseling that can reflect little other than their private views on the morality of premarital sex among the young. It seems evident that many physicians are likely to have views on this subject to a significant degree more permissive or more restrictive than those of the State, the minor, or the minor's parents. Moreover, nothing in § 6807 (b) suggests that the role of the physician is limited to such "counseling." The statute does nothing more than to permit the physician to provide his patients with such drugs or devices as he "deems proper." Such "absolute, and possibly arbitrary" discretion over the privacy rights of minors is precisely what *Planned Parenthood* condemned. 428 U. S., at 74.

[25] In cases involving abortions, we have emphasized that the decision to terminate a pregnancy is properly made by a woman in consultation with her physician. See, *e. g., Roe* v. *Wade,* 410 U. S. 113, 153, 164 (1973); *Planned Parenthood of Central Missouri* v. *Danforth,* 428 U. S.,

## V

The District Court's holding that the prohibition of any "advertisement or display" of contraceptives is unconstitutional was clearly correct. Only last Term *Virginia Pharmacy Bd.* v. *Virginia Citizens Consumer Council,* 425 U. S. 748 (1976), held that a State may not "completely suppress the dissemination of concededly truthful information about entirely lawful activity," even when that information could be categorized as "commercial speech." *Id.,* at 773. Just as in that case, the statute challenged here seeks to suppress completely any information about the availability and price of contraceptives.[26] Nor does the case present any question left open in *Virginia Pharmacy Bd.;* here, as there, there can be no contention that the regulation is "a mere time, place, and manner restriction," *id.,* at 771, or that it prohibits only misleading or deceptive advertisements, *ibid.,* or "that the transactions proposed in the forbidden advertisements are themselves illegal in any way. Cf. *Pittsburgh Press Co.* v. *Human Relations Comm'n,* [413 U. S. 376 (1973)]." *Id.,* at 772–773. Moreover, in addition to the "substantial individual and societal interests" in the free flow of commercial information enumerated in *Virginia Pharmacy Bd., supra,* at 763–766, the

at 75. No such suggestion, however, has been made concerning the right to obtain or use contraceptives. See *Griswold* v. *Connecticut, supra; Eisenstadt* v. *Baird,* 405 U. S. 438 (1972). The reason, of course, is that the abortion decision necessarily involves a medical judgment, *Roe* v. *Wade, supra,* at 164, while the decision to use a nonhazardous contraceptive does not. *Eisenstadt* v. *Baird, supra,* at 463–464 (WHITE, J., concurring in result). See also n. 24, *supra.*

[26] The prohibition of advertising and display of contraceptives is invalid as to prescription as well as nonprescription contraceptives, at least when the advertising is by persons who are licensed to sell such products. *Virginia Pharmacy Bd.* v. *Virginia Citizens Consumer Council,* 425 U. S. 748 (1976).

information suppressed by this statute "related to activity with which, at least in some respects, the State could not interfere." 425 U. S., at 760. Cf. *Bigelow* v. *Virginia*, 421 U. S. 809 (1975).

Appellants contend that advertisements of contraceptive products would be offensive and embarrassing to those exposed to them, and that permitting them would legitimize sexual activity of young people. But these are classically not justifications validating the suppression of expression protected by the First Amendment. At least where obscenity is not involved, we have consistently held that the fact that protected speech may be offensive to some does not justify its suppression. See, *e. g., Cohen* v. *California*, 403 U. S. 15 (1971).[27] As for the possible "legitimation" of illicit sexual behavior, whatever might be the case if the advertisements directly incited illicit sexual activity among the young, none of the advertisements in this record can even remotely be characterized as "directed to inciting or producing imminent lawless action and . . . likely to incite or produce such action." *Brandenburg* v. *Ohio*, 395 U. S. 444, 447 (1969). They merely state the availability of products and services that are not only entirely legal, cf. *Pittsburgh Press Co.* v. *Human Relations Comm'n*, 413 U. S. 376 (1973), but constitutionally protected. Cf. *Bigelow* v. *Virginia, supra.*[28] These arguments

---

[27] Indeed, as the Court recognized in *Virginia Pharmacy Bd.*, much advertising is "tasteless and excessive," and no doubt offends many. 425 U. S., at 765.

[28] Appellants suggest no distinction between commercial and noncommercial speech that would render these discredited arguments meritorious when offered to justify prohibitions on commercial speech. On the contrary, such arguments are clearly directed not at any commercial aspect of the prohibited advertising but at the ideas conveyed and form of expression—the core of First Amendment values. Cf. *Linmark Associates, Inc.* v. *Willingboro, ante*, at 96–97.

therefore do not justify the total suppression of advertising concerning contraceptives.[29]

*Affirmed.*

THE CHIEF JUSTICE dissents.

MR. JUSTICE WHITE, concurring in part and concurring in the result.

I join Parts I, III, and V of the Court's opinion and concur in the result with respect to Part IV.*

Although I saw no reason in *Eisenstadt* v. *Baird,* 405 U. S. 438 (1972), to reach "the novel constitutional question whether a State may restrict or forbid the distribution of contraceptives to the unmarried," *id.,* at 465 (concurring in result), four of the seven Justices participating in that case held that in this respect the rights of unmarried persons were equal to those of the married. Given *Eisenstadt* and given the decision of the Court in the abortion case, *Roe* v. *Wade,* 410 U. S. 113 (1973), the result reached by the Court in Part III of its opinion appears warranted. I do not regard the opinion, however, as declaring unconstitutional any state law forbidding extramarital sexual relations. On this assumption I join Part III.

I concur in the result in Part IV primarily because the State has not demonstrated that the prohibition against distribution of contraceptives to minors measurably contributes to the deterrent purposes which the State advances as justification for the restriction. Again, however, the legality of state laws forbidding premarital intercourse is not at issue here; and, with MR. JUSTICE STEVENS, "I would describe as

---

[29] We do not have before us, and therefore express no views on, state regulation of the time, place, or manner of such commercial advertising based on these or other state interests.

*There is no need for present purposes to agree or disagree with the Court's summary of the law expressed in Part II.

'frivolous' appellees' argument that a minor has the constitutional right to put contraceptives to their intended use, notwithstanding the combined objection of both parents and the State," *post,* at 713.

In joining Part V of the Court's opinion, I should also say that I agree with the views of MR. JUSTICE STEVENS expressed in Part II of his separate opinion.

MR. JUSTICE POWELL, concurring in part and concurring in the judgment.

I agree that Population Planning Associates has standing to maintain this action, and therefore join Part I of the Court's opinion. Although I concur in the judgment of the Court, I am not persuaded that the Constitution requires the severe constraints that the Court's opinion places upon legislative efforts to regulate the distribution of contraceptives, particularly to the young.

## I

The Court apparently would subject all state regulation affecting adult sexual relations to the strictest standard of judicial review. Under today's decision, such regulation "may be justified only by compelling state interests, and must be narrowly drawn to express only those interests." *Ante,* at 686. Even regulation restricting only the sexual activity of the young must now be justified by a "significant state interest," a standard that is "apparently less rigorous" than the standard the Court would otherwise apply. *Ante,* at 693 n. 15. In my view, the extraordinary protection the Court would give to all personal decisions in matters of sex is neither required by the Constitution nor supported by our prior decisions.

## A

The cases on which the Court relies for its "compelling interest" standard do not support the sweeping principle it adopts today. Those cases generally involved direct and sub-

stantial interference with constitutionally protected rights. In *Griswold* v. *Connecticut,* 381 U. S. 479 (1965), the Court invalidated a state statute prohibiting the use of contraceptives and making it illegal for physicians to give advice to married persons regarding contraception. The statute was viewed as one "operat[ing] directly on an intimate relation of husband and wife and their physician's role in one aspect of that relation," *id.,* at 482, and "seek[ing] to achieve its goals by means having a maximum destructive impact upon that relationship," *id.,* at 485. In *Roe* v. *Wade,* 410 U. S. 113 (1973), the Court reviewed a Texas statute imposing severe criminal sanctions on physicians and other medical personnel who performed nontherapeutic abortions, thus effectively foreclosing the availability and safety of this desired service. And just last Term, in *Planned Parenthood of Central Missouri* v. *Danforth,* 428 U. S. 52 (1976), we invalidated Missouri's requirement of spousal consent as a state-imposed "absolute obstacle to a woman's decision that *Roe* held to be constitutionally protected from such interference." *Id.,* at 71 n. 11.

The Court relies on *Planned Parenthood, supra,* and *Doe* v. *Bolton,* 410 U. S. 179 (1973), for the proposition that "the same test must be applied to state regulations that burden an individual's right to decide to prevent conception or terminate pregnancy by substantially limiting access to the means of effectuating that decision as is applied to state statutes that prohibit the decision entirely." *Ante,* at 688. But neither of those cases refers to the "compelling state interest" test. In *Bolton,* the Court invalidated procedural requirements of the Georgia abortion statute that were found not "reasonably related" to the asserted legislative purposes or to the "patient's needs." 410 U. S., at 194, 199. *Planned Parenthood* involved— in addition to the "absolute obstacle" referred to above—the Missouri requirement of prior written consent by the pregnant woman. Despite the fact that Missouri normally did not require written consent for other surgical procedures, the Court

sustained this regulation without requiring any demonstration of compelling state interests. The Court recognized that the decision to abort "is an important, and often a stressful one," and the State thus constitutionally could assure that the woman was aware of the significance of the decision. 428 U. S., at 67.

In sum, the Court quite unnecessarily extends the reach of cases like *Griswold* and *Roe*. Neither our precedents nor sound principles of constitutional analysis require state legislation to meet the exacting "compelling state interest" standard whenever it implicates sexual freedom. In my view, those cases make clear that that standard has been invoked only when the state regulation entirely frustrates or heavily burdens the exercise of constitutional rights in this area. See *Bellotti* v. *Baird,* 428 U. S. 132, 147 (1976). This is not to say that other state regulation is free from judicial review. But a test so severe that legislation rarely can meet it should be imposed by courts with deliberate restraint in view of the respect that properly should be accorded legislative judgments.

## B

There is also no justification for subjecting restrictions on the sexual activity of the young to heightened judicial review. Under our prior cases, the States have broad latitude to legislate with respect to adolescents. The principle is well settled that "a State may permissibly determine that, at least in some precisely delineated areas, a child . . . is not possessed of that full capacity for individual choice" which is essential to the exercise of various constitutionally protected interests. *Ginsberg* v. *New York,* 390 U. S. 629, 649–650 (1968) (STEWART, J., concurring in result). This principle is the premise of our prior decisions, ostensibly reaffirmed by the plurality, *ante,* at 692, holding that "the power of the state to control the conduct of children reaches beyond the scope of its authority over adults." *Prince* v. *Massachusetts,* 321 U. S. 158, 170 (1944).

Restraints on the freedom of minors may be justified "even though comparable restraints on adults would be constitutionally impermissible." *Planned Parenthood of Central Missouri* v. *Danforth, supra,* at 102 (STEVENS, J., concurring in part and dissenting in part).[1]

New York has exercised its responsibility over minors in areas falling within the "cluster of constitutionally protected choices" relating to sex and marriage. *Ante,* at 685. It has set an age limitation below which persons cannot marry without parental consent, N. Y. Dom. Rel. Law §§ 15, 15–a (McKinney 1964 and Supp. 1976–1977), and has established by statute the age at which a minor is legally recognized as having the capacity to consent to sexual activity, Penal Law § 130.05 (3) (a) (McKinney 1975). See also Penal Law §§ 130.25, 130.30, 130.35 (McKinney 1975). These provisions highlight the State's concern that its juvenile citizens generally lack the maturity and understanding necessary to make decisions concerning marriage and sexual relationships.

Until today, I would not have thought it was even arguably necessary to review state regulation of this sort under a standard that for all practical purposes approaches the "compelling state interest" standard. At issue in *Ginsberg* v. *New York, supra,* for example, was the question of the constitutionality on its face of a New York criminal obscenity statute which prohibited the sale to minors of material defined to be obscene on the basis of its appeal to them whether or not it would be obscene to adults. The Court recognized that "the State has

---

[1] MR. JUSTICE STEVENS recently provided the following examples, deeply rooted in our traditions and law:

"Because he may not foresee the consequences of his decision, a minor may not make an enforceable bargain. He may not lawfully work or travel where he pleases, or even attend exhibitions of constitutionally protected adult motion pictures. Persons below a certain age may not marry without parental consent. Indeed, such consent is essential even when the young woman is already pregnant." 428 U. S., at 102.

an interest 'to protect the welfare of children' and to see that they are 'safeguarded from abuses' which might prevent their 'growth into free and independent well-developed men and citizens.'" 390 U. S., at 640–641, quoting *Prince* v. *Massachusetts, supra,* at 165. Consequently, the "only question remaining" in that case was "whether the New York Legislature might rationally conclude, as it has, that exposure to the materials proscribed by [the statute] constitutes such an 'abuse.'" 390 U. S., at 641. Similarly, the relevant question in any case where state laws impinge on the freedom of action of young people in sexual matters is whether the restriction rationally serves valid state interests.

## II

With these considerations in mind, I turn to the specific provisions of the New York statute limiting the distribution of contraceptives.

### A

New York has made it a crime for anyone other than a physician to sell or distribute contraceptives to minors under the age of 16 years. Educ. Law § 6811 (8) (McKinney 1972). This element of New York's program of regulation for the protection of its minor citizens is said to evidence the State's judgment that the health and well-being of minors would be better assured if they are not encouraged to engage in sexual intercourse without guidance. Although I have no doubt that properly framed legislation serving this purpose would meet constitutional standards, the New York provision is defective in two respects. First, it infringes the privacy interests of married females between the ages of 14 and 16, see *ante,* at 695 n. 18, in that it prohibits the distribution of contraceptives to such females except by a physician. In authorizing marriage at that age, the State also sanctions sexual intercourse between the partners and expressly recognizes that once the marriage relationship exists the husband and

wife are presumed to possess the requisite understanding and maturity to make decisions concerning sex and procreation. Consequently, the state interest that justifies a requirement of prior counseling with respect to minors in general simply is inapplicable with respect to minors for whom the State has affirmatively approved marriage.

Second, this provision prohibits parents from distributing contraceptives to their children, a restriction that unjustifiably interferes with parental interests in rearing their children. Cf. *Ginsberg* v. *New York,* 390 U. S., at 639 and n. 7. "[C]onstitutional interpretation has consistently recognized that the parents' claim to authority in their own household to direct the rearing of their children is basic in the structure of our society. 'It is cardinal with us that the custody, care and nurture of the child reside first in the parents, whose primary function and freedom include preparation for obligations the state can neither supply nor hinder.'" *Ibid.,* quoting *Prince* v. *Massachusetts, supra,* at 166. See *Wisconsin* v. *Yoder,* 406 U. S. 205, 231–233 (1972); *Pierce* v. *Society of Sisters,* 268 U. S. 510, 534–535 (1925); *Meyer* v. *Nebraska,* 262 U. S. 390, 399–401 (1923). Moreover, this statute would allow the State "to enquire into, prove, and punish," *Poe* v. *Ullman,* 367 U. S. 497, 548 (1961) (Harlan, J., dissenting), the exercise of this parental responsibility. The State points to no interest of sufficient magnitude to justify this direct interference with the parental guidance that is especially appropriate in this sensitive area of child development.[2]

---

[2] The particular provision at issue makes it a crime for "[a]ny person to sell or distribute any instrument or article, or any recipe, drug or medicine for the prevention of contraception to a minor under the age of sixteen years . . . ." Educ. Law § 6811 (8) (McKinney 1972). For the reasons stated in the text, this provision unjustifiably infringes the constitutionally protected interests of parents and married female minors, and it is invalid in those two respects. Although the prohibition on distribution might be sustained as to other individuals if the restrictions on

But in my view there is considerably more room for state regulation in this area than would be permissible under the plurality's opinion. It seems clear to me, for example, that the State would further a constitutionally permissible end if it encouraged adolescents to seek the advice and guidance of their parents before deciding whether to engage in sexual intercourse. *Planned Parenthood,* 428 U. S., at 91 (STEWART, J., concurring). The State justifiably may take note of the psychological pressures that might influence children at a time in their lives when they generally do not possess the maturity necessary to understand and control their responses. Participation in sexual intercourse at an early age may have both physical and psychological consequences. These include the risks of venereal disease and pregnancy, and the less obvious mental and emotional problems that may result from sexual activity by children. Moreover, society has long adhered to the view that sexual intercourse should not be engaged in promiscuously, a judgment that an adolescent may be less likely to heed than an adult.

Requiring minors to seek parental guidance would be consistent with our prior cases. In *Planned Parenthood,* we considered whether there was "any significant state interest in conditioning [a minor's] abortion [decision] on the consent of a parent or person *in loco parentis* that is not present in the case of an adult." 428 U. S., at 75. Observing that the minor necessarily would be consulting with a physician on all aspects of the abortion decision, we concluded that the Missouri requirement was invalid because it im-

---

parental distribution and distribution to married female minors could be treated as severable, the result "would be to create a program quite different from the one the legislature actually adopted." *Sloan* v. *Lemon,* 413 U. S. 825, 834 (1973). I therefore agree with the Court that the entire provision must be invalidated. See *Dorchy* v. *Kansas,* 264 U. S. 286, 291 (1924); *Dollar Co.* v. *Canadian C. & F. Co.,* 220 N. Y. 270, 279, 115 N. E. 711, 713 (1917).

posed "a special-consent provision, exercisable by a person other than the woman and her physician, as a prerequisite to a minor's termination of her pregnancy and [did] so without a sufficient justification for the restriction." *Ibid.* But we explicitly suggested that a materially different constitutional issue would be presented with respect to a statute assuring in most instances consultation between the parent and child. *Ibid.,* citing *Bellotti* v. *Baird,* 428 U. S. 132 (1976). See *Planned Parenthood, supra,* at 90–91 (STEWART, J., concurring).

A requirement of prior parental consultation is merely one illustration of permissible regulation in this area. As long as parental distribution is permitted, a State should have substantial latitude in regulating the distribution of contraceptives to minors.[3]

## B

New York also makes it a crime for anyone other than a licensed pharmacist to sell or distribute contraceptives to adults and to minors aged 16 or over. The only serious justification offered by the State for this prohibition is that it is necessary to facilitate enforcement of the limitation on distribution to children under 16 years of age. Since the Court invalidates that limitation today, the pharmacy restriction lacks any rational justification. I therefore agree with the Court that § 6811 (8)'s limitation on the distribution of nonprescription contraceptives cannot be sustained.

But even if New York were to enact constitutionally permissible limitations on access for children, I doubt that it could justify the present pharmacy restriction as an enforcement measure. Restricting the kinds of retail outlets that may dis-

---

[3] As long as access is available through parents, I perceive no constitutional obstacle to state regulation that authorizes other designated adults—such as physicians—to provide relevant counseling.

tribute contraceptives may well be justified,[4] but the present statute even prohibits distribution by mail to adults. In this respect, the statute works a significant invasion of the constitutionally protected privacy in decisions concerning sexual relations. By requiring individuals to buy contraceptives over the counter, the statute heavily burdens constitutionally protected freedom.[5]

### III

I also agree with the Court that New York cannot lawfully prohibit all "advertisement or display" of contraceptives. But it seems to me that the Court's opinion may be read too broadly. It flatly dismisses, as justifications "classically" irrelevant, the State's contentions that the indiscriminate advertisement of contraceptive products in some settings could be unduly offensive and could be viewed by the young as legitimation of sexual promiscuity. I agree that these jus-

---

[4] Absent some evidence that a restriction of outlets to registered pharmacists heavily burdens the constitutional interests of adults, there would be no basis for applying the standard of review articulated in *Griswold* and *Roe*. See Part I, *supra*. Indeed, in the absence of such evidence there would be no reason to set aside a legislative judgment that enforcement of constitutionally permissible limitations on access for minors, see Part II–A, *supra*, warrants a reasonable limitation on the means for marketing contraceptives. Without some limitations on the number and type of retail outlets it would be difficult—if not impossible—to effectuate the state interest in assuring that minors are counseled before purchasing contraceptive devices. As pharmacists are licensed professionals, the State may be justified in relying on them to act responsibly in observing regulations applicable to minors.

[5] It is not a satisfactory answer that an individual may preserve anonymity as one of a number of customers in a retail outlet. However impersonal the marketplace may be, it does not approach the privacy of the home. There may be some risk that mail distribution will occasionally permit circumvention of permissible restrictions with respect to children, but this does not justify the concomitant burden on the constitutional rights of adults.

tifications cannot support a complete ban on advertising, but I see no reason to cast any doubt on the authority of the State to impose carefully tailored restrictions designed to serve legitimate governmental concerns as to the effect of commercial advertising on the young.[6]

MR. JUSTICE STEVENS, concurring in part and concurring in the judgment.

For the reasons stated in Parts I, II, and III of the opinion of the Court, which I join, I agree that Population Planning Associates, Inc., has standing to challenge the New York statute and that the grant to licensed pharmacists of a monopoly in the distribution of nonmedical contraceptives is unconstitutional. I also agree with the conclusion that New York's prohibition against the distribution of contraceptives to persons under 16 years of age is unconstitutional, and with the Court's conclusion that the total suppression of advertising or display of contraceptives is invalid, but my reasons differ from those set forth in Part IV of MR. JUSTICE BREN-

---

[6] The State argues that unregulated commercial advertisement of contraceptive products would be viewed by the young as "legitimation" of—if not an open invitation to—sexual promiscuity. The Court simply finds on the basis of the advertisements in the record before us that this interest does not justify total suppression of advertising concerning contraceptives. The Court does leave open the question whether this or other state interests would justify regulation of the time, place, or manner of such commercial advertising. *Ante*, at 702 n. 29. In my view, such carefully tailored restrictions may be especially appropriate when advertising is accomplished by means of the electronic media. As Judge Leventhal recently observed in that context: "[T]here is a distinction between the all-out prohibition of a censor, and regulation of time and place of speaking out, which still leaves access to a substantial part of the mature audience. What is entitled to First Amendment protection is not necessarily entitled to First Amendment protection in all places. *Young* v. *American Mini Theatres, Inc.*, 427 U. S. 50 . . . (1976). Nor is it necessarily entitled to such protection at all times." *Pacifica Foundation* v. *FCC*, 181 U. S. App. D. C. 132, 157, 556 F. 2d 9, 34 (1977) (dissenting opinion).

NAN's opinion and I wish to add emphasis to the limitation on the Court's holding in Part V.

I

There are two reasons why I do not join Part IV. First, the holding in *Planned Parenthood of Missouri* v. *Danforth,* 428 U. S. 52, 72–75, that a minor's decision to abort her pregnancy may not be conditioned on parental consent, is not dispositive here. The options available to the already pregnant minor are fundamentally different from those available to nonpregnant minors. The former must bear a child unless she aborts; but persons in the latter category can and generally will avoid childbearing by abstention. Consequently, even if I had joined that part of *Planned Parenthood,* I could not agree that the Constitution provides the same measure of protection to the minor's right to use contraceptives as to the pregnant female's right to abort.

Second, I would not leave open the question whether there is a significant state interest in discouraging sexual activity among unmarried persons under 16 years of age. Indeed, I would describe as "frivolous" appellees' argument that a minor has the constitutional right to put contraceptives to their intended use, notwithstanding the combined objection of both parents and the State.

For the reasons explained by MR. JUSTICE POWELL, I agree that the statute may not be applied to married females between the ages of 14 and 16, or to distribution by parents. I am not persuaded, however, that these glaring defects alone justify an injunction against other applications of the statute. Only one of the three plaintiffs in this case is a parent who wishes to give contraceptives to his children. The others are an Episcopal minister who sponsors a program against venereal disease, and a mail-order firm, which presumably has no way to determine the age of its customers. I am satisfied, for the reasons that follow, that the statute is also invalid as applied to them.

The State's important interest in the welfare of its young citizens justifies a number of protective measures. See *Planned Parenthood of Central Missouri* v. *Danforth, supra,* at 102 (STEVENS, J., concurring in part and dissenting in part). Such special legislation is premised on the fact that young persons frequently make unwise choices with harmful consequences; the State may properly ameliorate those consequences by providing, for example, that a minor may not be required to honor his bargain. It is almost unprecedented, however, for a State to require that an ill-advised act by a minor give rise to greater risk of irreparable harm than a similar act by an adult.[1]

Common sense indicates that many young people will engage in sexual activity regardless of what the New York Legislature does; and further, that the incidence of venereal disease and premarital pregnancy is affected by the availability or unavailability of contraceptives. Although young persons theoretically may avoid those harms by practicing total abstention, inevitably many will not. The statutory prohibition denies them and their parents a choice which, if available, would reduce their exposure to disease or unwanted pregnancy.

---

[1] Only two other States have adopted similar legislation. Family Planning, Contraception and Voluntary Sterilization: An Analysis of Laws and Policies in the United States, Each State and Jurisdiction, A Report of the National Center for Family Planning Services 76 (1971) (DHEW Pub. No. (HSA) 74–16001). This publication contains a comprehensive survey of state laws in this area. The authors were aware of "no case in which either a doctor or a layman has been successfully prosecuted under any criminal statute for providing contraceptive information or services to a minor or has been held liable for damages for providing contraception to a minor without parental consent." *Id.,* at 70. This survey also indicated that "the clear trend is toward the removal of all such barriers to the sale and distribution of contraceptives." *Id.,* at 59. By 1971 there were 34 States with no law restricting or regulating distribution of contraceptives, *ibid.,* and 33 States with no restrictions on advertising or display. *Id.,* at 60.

The State's asserted justification is a desire to inhibit sexual conduct by minors under 16. Appellants do not seriously contend that if contraceptives are available, significant numbers of minors who now abstain from sex will cease abstaining because they will no longer fear pregnancy or disease.[2] Rather appellants' central argument is that the statute has the important *symbolic* effect of communicating disapproval of sexual activity by minors.[3] In essence, therefore, the statute is defended as a form of propaganda, rather than a regulation of behavior.[4]

Although the State may properly perform a teaching function, it seems to me that an attempt to persuade by inflicting harm on the listener is an unacceptable means of conveying a message that is otherwise legitimate. The propaganda technique used in this case significantly increases the risk of unwanted pregnancy and venereal disease. It is as though a State decided to dramatize its disapproval of motorcycles by forbidding the use of safety helmets. One need not posit a constitutional right to ride a motorcycle to characterize such a restriction as irrational and perverse.

Even as a regulation of behavior, such a statute would be defective. Assuming that the State could impose a uniform

---

[2] Appellants make this argument only once, in passing. See Brief for Appellants 20. In the District Court, appellants candidly admitted that "there is no evidence that teenage extramarital sexual activity increases in proportion to the availability of contraceptives. . . ." See 398 F. Supp. 321, 332. Indeed, appellants maintain that it is a "fact that youngsters will not use contraceptives even where available . . . ." Reply Brief for Appellants 5.

[3] The fact that the State admittedly has never brought a prosecution under the statute, *id.*, at 2, is consistent with appellants' position that the purpose of the statute is merely symbolic.

[4] Appellants present no empirical evidence to support the conclusion that the State's "propaganda" is effective. Simply as a matter of common sense, it seems unlikely that many minors under 16 are influenced by the mere existence of a law indirectly disapproving of their conduct.

sanction upon young persons who risk self-inflicted harm by operating motorcycles, or by engaging in sexual activity, surely that sanction could not take the form of deliberately injuring the cyclist or infecting the promiscuous child. If such punishment may not be administered deliberately, after trial and a finding of guilt, it manifestly cannot be imposed by a legislature, indiscriminately and at random. This kind of government-mandated harm, is, in my judgment, appropriately characterized as a deprivation of liberty without due process of law.

## II

In Part V of its opinion, the Court holds that New York's total ban on contraceptive advertising is unconstitutional under *Bigelow* v. *Virginia,* 421 U. S. 809, and *Virginia Pharmacy Bd.* v. *Virginia Citizens Consumer Council,* 425 U. S. 748. Specifically, the Court holds that all contraceptive advertising may not be suppressed because *some* advertising of that subject may be offensive and embarrassing to the reader or listener. I also agree with that holding.

The Court properly does not decide whether the State may impose any regulation on the content of contraceptive advertising in order to minimize its offensive character. I have joined Part V of the opinion on the understanding that it does not foreclose such regulation simply because an advertisement is within the zone protected by the First Amendment.

The fact that a type of communication is entitled to some constitutional protection does not require the conclusion that it is totally immune from regulation. Cf. *Young* v. *American Mini Theatres, Inc.,* 427 U. S. 50, 65–71 (opinion of STEVENS, J.). An editorial and an advertisement in the same newspaper may contain misleading matter in equal measure. Although each is a form of protected expression, one may be censored while the other may not.

In the area of commercial speech—as in the business of exhibiting motion pictures for profit—the offensive character of

the communication is a factor which may affect the time, place, or manner in which it may be expressed. Cf. *Young* v. *American Mini Theatres, Inc., supra.* The fact that the advertising of a particular subject matter is *sometimes* offensive does not deprive all such advertising of First Amendment protection; but it is equally clear to me that the existence of such protection does not deprive the State of all power to regulate such advertising in order to minimize its offensiveness. A picture which may appropriately be included in an instruction book may be excluded from a billboard.

I concur in the judgment and in Parts I, II, III, and V of the Court's opinion.

MR. JUSTICE REHNQUIST, dissenting.

Those who valiantly but vainly defended the heights of Bunker Hill in 1775 made it possible that men such as James Madison might later sit in the first Congress and draft the Bill of Rights to the Constitution. The post-Civil War Congresses which drafted the Civil War Amendments to the Constitution could not have accomplished their task without the blood of brave men on both sides which was shed at Shiloh, Gettysburg, and Cold Harbor. If those responsible for these Amendments, by feats of valor or efforts of draftsmanship, could have lived to know that their efforts had enshrined in the Constitution the right of commercial vendors of contraceptives to peddle them to unmarried minors through such means as window displays and vending machines located in the men's room of truck stops, notwithstanding the considered judgment of the New York Legislature to the contrary, it is not difficult to imagine their reaction.[1]

---

[1] As well as striking down the New York prohibitions of commercial advertising and sales to persons under 16, the Court holds invalid the State's requirement that all sales be made by licensed pharmacists. Whatever New York's reasons for this particular restriction on distribution—and several can be imagined—I cannot believe that it could significantly impair

I do not believe that the cases discussed in the Court's opinion require any such result, but to debate the· Court's treatment of the question on a case-by-case basis would concede more validity to the result reached by the Court than I am willing to do.[2] There comes a point when endless and ill-considered extension of principles originally formulated in quite different cases produces such an indefensible result that no logic chopping can possibly make the fallacy of the result more obvious. The Court here in effect holds that the First and Fourteenth Amendments not only guarantee full and free debate *before* a legislative judgment as to the moral dangers to which minors within the jurisdiction of the State should not be subjected, but goes further and absolutely prevents the representatives of the majority from carrying out such a policy *after* the issues have been fully aired.

No questions of religious belief, compelled allegiance to a secular creed, or decisions on the part of married couples as to procreation, are involved here. New York has simply decided that it wishes to discourage unmarried minors under 16 from having promiscuous sexual intercourse with one another. Even the Court would scarcely go so far as to say that this is not a subject with which the New York Legislature may properly concern itself.

That legislature has not chosen to deny to a pregnant woman, after the *fait accompli* of pregnancy, the one remedy

---

the access to these products of a person with a settled and deliberate intention to procure them.

[2] I cannot, however, let pass without comment, the statement that "the Court has not definitively answered the difficult question whether and to what extent the Constitution prohibits state statutes regulating [private consensual sexual] behavior among adults." *Ante,* at 688 n. 5, 694 n. 17. While we have not ruled on every conceivable regulation affecting such conduct the facial constitutional validity of criminal statutes prohibiting certain consensual acts has been "definitively" established. *Doe* v. *Commonwealth's Attorney,* 425 U. S. 901 (1976). See *Hicks* v. *Miranda,* 422 U. S. 332, 343–344 (1975).

which would enable her to terminate an unwanted pregnancy. It has instead sought to deter the conduct which will produce such *faits accomplis*. The majority of New York's citizens are in effect told that however deeply they may be concerned about the problem of promiscuous sex and intercourse among unmarried teenagers, they may not adopt this means of dealing with it. The Court holds that New York may not use its police power to legislate in the interests of its concept of the public morality as it pertains to minors. The Court's denial of a power so fundamental to self-government must, in the long run, prove to be but a temporary departure from a wise and heretofore settled course of adjudication to the contrary. I would reverse the judgment of the District Court.