OPINION OF THE COURT
Aileen H. Schwartz, J.
The real question in this case is whether the State may use the newly won constitutional rights of minors to relieve itself of all responsibility as parens patriae in dealing with minors who are parents. Not only does the issue pose novel considerations, but its import is of more than limited effect because the facts reveal a system gone amiss and, indeed, unprepared for the singular dilemma of teenage pregnancy in our time.
Janet. G., a 17-year-old minor, alone and unaware of her right of choice and ignorant of the nature and consequences of her action, signed a two-page printed form agreement, formulated by the Commissioner of Social Services (CSS), providing *135 for the surrender[1] of her eight-week-old baby to the CSS (the surrender instrument is set forth as Appendix A). The document and related papers were presented to her for signature during a 20- to 30-minute meeting initiated and scheduled by the New York Foundling Hospital (NYFH) as agent for CSS. Approximately six weeks later Janet G. sought the return of her baby.
The commissioner stood and continues to stand resolutely on the instrument and the contractual right to the baby.
Janet G., supported by the father of the child and the entire G. family, instituted this proceeding for revocation of the surrender and custody of the baby two weeks after denial of her request.[2] The CSS is joined by the NYFH and the prospective adoptive parents as intervenors. A Law Guardian was appointed for the baby.
From the first realization of her pregnancy, shortly after her 17th birthday on September 25, 1976, Janet G. determined that she would bear and raise her child. The father, her high school boyfriend, proved to be of little comfort, and she did not see him after December, 1976. She told no one else until late May or early June, 1977, virtually the eve of birth of the baby, when she informed her twin sister, her best friend and later, her father upon their respective inquiries. Her father was shocked and told her that she would not be permitted to bring the baby into their home, that she was not to leave the home, and the baby would have to be "put up” for adoption to avoid disgrace to the family. Janet G.’s parents had separated informally in the summer of 1976 with her mother’s departure from the family home to establish a separate household consisting of two daughters and the maternal grandmother. In addition to Janet, Janet’s twin sister, a brother and the paternal grandfather remained with the father. Janet G.’s father is a New York City fireman of some 20 years’ standing and her mother, a personnel department employee of the New York Telephone Company. Her father informed her mother of the pregnancy and the decision.
Janet complied with her father’s commands. On June 3, *136 1977, she accompanied him to NYFH to seek aid regarding a maternity shelter and ultimate adoption. Before admission to the shelter could be scheduled, however, Janet G. gave birth to her child, Jennifer, on June 14, 1977. Consonant with his plan to maintain secrecy, Janet G.’s father admonished her not to see the child, and he arranged for her release from the hospital and return home two days later on June 16, 1977. A few hours after her arrival home, a CSS social worker came to their house, and Janet G. and her father signed papers for foster care for Jennifer.
With the exception of a single telephone call to the CSS social worker to inquire about the baby’s well-being in midsummer 1977, the G. family did not communicate with the CSS or NYFH. Nor did the CSS or NYFH contact the G.’s until August 8, 1977. On that date, Sister D.S., the director of the NYFH Mothers’ Social Services Department, telephoned Janet G. to schedule an appointment for August 12, 1077, for Janet G. to sign further papers. There was no mention of the word "adoption” or "surrender.” Sister D.S. testified she used the word "final.” In any event, the word had no significance to Janet G. Janet G. understood only that papers had to be signed. August 12 was not convenient for her father, and Janet telephoned Sister D.S. and was advised, "Come alone.”
Upon Janet’s request, her twin sister and a friend went with her to the NYFH. When Sister D.S. came to the lobby to escort Janet G. to her office, Janet G. requested permission to have her sister accompany her. Sister D.S. remembered a request to have a "friend” present which she denied. Janet G. voiced no opposition.
Janet G. and Sister D.S. were alone for the greater part of their meeting. A stack of papers was on the desk in front of Sister D.S.’s chair. Sister D.S. did not advise Janet of the nature or effect of the papers. The papers were "read” together. A copy was given to Janet G., and Sister D.S. proceeded directly to read the papers aloud. To Janet, the reading seemed to be at a fast pace, ending with the phrase "and so on” several times. Janet did not actually read the. papers and she testified she was not afforded the opportunity to do so. Admittedly, she did not request such opportunity or question any part of the papers or transaction. She testified she trusted NYFH and believed she had no choice but to sign the papers presented to her for signature, then and there. Sister D.S. explained a few things such as the right of the CSS to consent *137 to medical treatment and to inform Jennifer about her mother. Then Sister D.S. asked her secretary into the room to serve as witness to the execution of the document. The three assembled around the desk. The surrender document was preprepared; required information had already been typed. Sister D.S. showed Janet G. where she should sign each document; Janet G. signed as directed; the secretary signed as witness; then Sister D.S. notarized each document. There were three sets of pertinent documents; there were five copies in each set, each of which had to be executed, witnessed and notarized in the above fashion.
Sister D.S. had assumed that execution of the documents was but a formality in the G. matter. Sister D.S. thus became one of the aggrieved, for unknown to her much had gone awry in the handling of the case:
1. Contrary to NYFH practice there had been no contact with Janet G. after the June 3, 1977 visit so as to afford her aid, consonant with her needs, even if only to provide information. NYFH’s employment of the social worker assigned to the G. case terminated sometime between the June 3 visit and August 12. There was some difficulty with her records in the G. matter, and efforts by NYFH, including Sister D.S., to reach her proved unsuccessful.
2. On August 12, Sister D.S. presumed that the aforesaid NYFH social worker had contacted and counseled Janet G. after Jennifer’s birth and she was under the impression that Janet G. had spoken to the CSS social worker after Jennifer’s birth regarding the surrender instrument. Hence, she assumed that Janet knew about the surrender document. In fact, both premises were erroneous.
3. CSS furnished the form instrument to NYFH as one of its agents authorized "to take a surrender to the CSS.” As composed, the subject instrument in its several parts and in its entirety presents difficulties even for those trained in the law, particularly the second page which contains the so-called "30-day or placed for adoption provision” and the "Social Services Law § 358-a waiver provisions.”
Thus, in departure from NYFH’s recognized obligation, there was no counseling services afforded Janet regarding adoption or alternatives thereto. On August 12, Janet was not advised that she did not then have to make a decision regarding her child; Janet was not permitted to have a sister or friend present as she had requested; Janet was not afforded an *138 opportunity to reflect on the terms of the instrument or to discuss the instrument with her father or mother. Significantly, her father testified that he would not have permitted her to consider an instrument of this nature in his absence. She was not afforded the opportunity to seek legal advice. Sister D.S. was unaware of the deficiencies in fulfillment of the obligation to Janet. Clearly, she was unaware of the legal technicalities involved in the agreement. Based upon her own testimony, her explanation of the import of the "30-day provision” was erroneous. Thus, Sister D.S., a dedicated social worker, was also a victim of the system. Indeed, she was one of the few persons kind to Janet G.
The entire matter from Sister D.S.’s greeting to Janet in the lobby to Janet’s return to the lobby took 30 minutes according to Sister D.S., 20 minutes according to Janet G., her sister and friend. Janet departed with the envelope into which Sister D.S. had placed copies of the documents and which Sister D.S. had then sealed. She did not open the envelope or speak to anyone regarding the papers until the end of September, 1977.
Janet maintained the firm impression and belief based upon her meeting with Sister D.S. that her child would not be adopted before the expiration of some six to nine months and that she had the same period of time within which to regain her child upon request.
Hardly a day passed without some mention to her friend or sister of her wishes for the child including the decision that her friend would be her child’s godmother. Contrasted with such discussions, she did not speak of the subject to her father. Attempts by her mother to talk about the baby met with silence or tears until the beginning of September. At that time, Janet and her mother gradually began to discuss the pragmatics of a plan to reunite mother and child. Janet’s mother assured Janet of financial support, a home for Janet and Jennifer, and aid to enable Janet to remain at home to care for her child until such time as the child reached school age and, further, to enable Janet then to continue her education and preparation for employment. On September 25, Janet G. became 18. That age meant adulthood-autonomy to her. Three days later, she telephoned Sister D.S. for the return of her child. Sister D.S. answered that it was too late. Janet G. left her father’s house that evening to live with her mother determined to regain her child. Her mother viewed all the papers in Janet’s possession; her father assumed responsibility *139 for counsel fees of a privately retained lawyer. Janet G. has been joined by the entire G. family, including her father, in seeking "their baby” and reunion of Jennifer with "the baby’s family.”
Unknown to the G. family, June 20, 1977, six days after her birth, NYFH placed Jennifer in the care of Mr. and Mrs. A., a childless couple, on a "boarding basis” with a view to legal adoption.[3] Although requested by NYFH, transfer of guardianship and custody to NYFH was not effected prior to the commencement of this proceeding on October 12, 1977, and no action in that regard has been taken during the pendency of the proceeding herein. Nevertheless, in-departure from established practice and although advised that CSS would not afford authorization, NYFH recorded Jennifer’s placement for adoption on October 13, 1977 and postdated the entry to October 12, 1977. The entry reads, "Retroactive to August 12th.” Payments to Mr. and Mrs. A. for foster care were terminated to reflect the mid-October date. Jennifer continues to live with Mr. and Mrs. A.
Janet G. urges several grounds for revocation of the surrender, none of which is barred by section 384 of the Social Services Law. The major thrust of her argument is challenge to the surrender as unconscionable and violative of due process under all the circumstances, especially her age. She maintains that she did not voluntarily, knowingly or intelligently surrender her child. As indicated above, the CSS joined by the NYFH and the intervenors rely upon the surrender and assert the constitutional right of a minor to surrender her child for adoption, the correlative duty of the State to equate minors and adults for surrender purposes, and the governing effect of contract law upon the transaction between the State and the minor.
Although now recognized as a virtual truism, the declaration that "neither the Fourteenth Amendment nor the Bill of Rights is for adults alone” in Matter of Gault (387 US 1, 13) wrought a veritable revolution in the name of equality for children. Yet, the very pronouncement voiced a perceptive *140 caveat lest the proclamation be viewed in absolute terms in defining the relationship between the juvenile and the State. Subsequent decisions have molded the contours of the Gault principle in evermore inclusive dimensions that now encompass a "cluster of constitutionally protected choices.” (Carey v Population Servs. Int., 431 US 678, 685.) Notwithstandng the expansive sphere of children’s rights, the Supreme Court has not become less sensitive to the concomitant pragmatic problems arising from the very nature of the child and has painstakingly emphasized that recognition of the constitutional rights of minors does not transmute children into adults. Indeed, the special concern to safeguard children’s rights in practice has heightened with the extension of such rights to include autonomy in making decisions involving aspects of privacy deemed fundamental to personal liberty, e.g., the decision whether or not to bear or beget a child, the decision whether or not to terminate a pregnancy.
The reason for increased concern as children’s rights progress from procedural due process rights to substantive due process rights that include " 'independence in making certain kinds of important decisions’ ” is clear. (Carey v Population Servs. Int., supra, p 693, n 15.) "[T]he law has generally regarded minors as having a lesser capability for making important decisions.” (Carey v Population Servs. Int., supra, p 693, n 15.) Mr. Justice Stevens best portrayed the protective aegis afforded minors consistent with deeply rooted ethics, tradition and law: "The State’s interest in the welfare of its young citizens justifies a variety of protective measures. Because he may not foresee the consequences of his decision, a minor may not make an enforceable bargain. He may not lawfully work or travel where he pleases, or even attend exhibitions of constitutionally protected adult motion pictures. Persons below a certain age may not marry without parental consent. Indeed, such consent is essential even when the young woman is already pregnant.” (Planned Parenthood of Mo. v Danforth, 428 US 52, 102.)
Mindful that "there are unquestionably greater risks of inability to give an informed consent” on the part of minors (Bellotti v Barid, 428 US 132, 147), the Supreme Court emphasized that its holding "does not suggest that every minor, regardless of age or maturity, may give effective consent for termination of her pregnancy.” (Planned Parenthood of Mo. v Danforth, supra, p 75.) That word of caution reflects the *141 court’s abiding special concern for the manner in which minors’ rights are construed and implemented so as to safeguard against practices that would render the principle a cruel mockery.
So viewed, what is the surrender instrument, executed by a minor, which the State seeks to enforce to the letter to claim the baby? Section 384 of the Social Services Law provides, in pertinent part: "1. Method. The guardianship of the person and the custody of a destitute or dependent child under the age of eighteen years may be committed to an authorized agency [the CSS is an authorized agency] by a written instrument which shall be known as a surrender * * * 2. Terms. Such guardianship shall be in accordance with the provisions of this article and the instrument shall be upon such terms and subject to such conditions as may be agreed upon by the parties thereto. The instrument shall recite that the authorized agency is thereby authorized and empowered to consent to the adoption of such child in the place and stead of the person signing the instrument, and may recite that the person signing the instrument waives any notice of such adoption.” (Emphasis added.)
The statutory nomenclature is appropriate. The agreement is intended to effect a surrender of rights. Nor can it be seriously contested that the interest surrendered is nothing less than a constitutional right of the first magnitude, the right of the parent to raise her child (Stanley v Illinois, 405 US 645, 651) and the right of the child to be reared by her parent. (Matter of Bennett v Jeffreys, 40 NY2d 543, 546.) "The history and culture of Western civilization reflect a strong tradition of parental concern for the nurture and upbringing of their children. This primary role of the parents in the upbringing of their children is now established beyond debate as an enduring American tradition.” (Wisconsin v Yoder, 406 US 205, 232-233.) Earlier this year a unanimous Supreme Court declared in Quilloin v Walcott (434 US 246, 255; 98 S Ct 549, 554-555):
"We have recognized on numerous occasions that the relationship between parent and child is constitutionally protected. [Citations.] 'It is cardinal with us that the custody, care and nurture of the child reside first in the parents, whose primary function and freedom include preparation for obligations the state can neither supply nor hinder.’ [Citation.] And it is now firmly established that 'freedom of personal choice in *142 matters of . . . family life is one of the liberties protected by the Due Process Clause of the Fourteenth Amendment.’ [Citation.]
"We have little doubt that the Due Process Clause would be offended [i]f a State were to attempt to force the breakup of a natural family, over the objections of the parents and their children, without some showing of unfitness and for the sole reason that to do so was thought to be in the children’s best interest.’ ”
As a general proposition, the jural relationship between parent and child adheres to biological fact and is unaffected by the age of the parent. Contrasted with the conventional status afforded minors in the legal sphere, the statutory scheme regarding surrender of parental rights does not distinguish parents-minors as a class. The analogous provision for parental consent to adoption explicitly states, "parents or surviving parent, whether adult or infant” and "mother, whether adult or infant”. (Domestic Relations Law, § 111.) According to the CSS, "surrenders are taken routinely” from minors. Indeed, the thrust of the CSS’s position is that to do otherwise would violate the minor’s constitutional right to surrender her child. The CSS reasons that just as a minor has the constitutional right to abort a pregnancy as the counterpart to the constitutional right to bear a child, so the minor has the constitutional right to surrender parental rights to a child as the counterpart to the constitutional right to raise one’s child. To treat the minor in special fashion, e.g., to require the presence of a parent, CSS continues, would constitute an impermissible infringement of the minor’s right.
Assuming, arguendo, that the decision whether or not to surrender one’s child falls within the purview of the cluster of constitutionally protected choices and further that that right of decision is extended to minors, the fatal deficiency of the CSS’s stance lies in viewing the proclamation of the constitutional rights of the minor as justification for abdication of all parens patriae resposibility to minors. Granted that the Supreme Court has been vigilant in scrutinizing State impediments to the exercise of minors’ rights notwithstanding the State’s avowed intention to protect the minor. (See Carey v Population Servs. Int., 431 US 678, supra; Bellotti v Baird, 428 US 132, supra; Planned Parenthood of Mo. v Danforth, 428 US 52, supra.) That does not mean that the State, in the name of the individual’s constitutional rights, may treat minors as the *143 contractual equals of the State and deal with them according to the "morals of the market place.”
There is grim irony in speaking of the freedom of contract of a minor-parent, alone and uncounseled, faced with the printed form surrender prepared by the State. (Moorehead v New York ex rel. Tipaldo, 298 US 587, 632 [Stone, J., dissenting].) "Does any principle in our law have more universal application than the doctrine that courts will not enforce transactions in which the relative positions of the parties are such that one has unconsicionably taken advantage of the necessities of the other?” (United States v Bethlehem Steel Corp., 315 US 289, 326 [Frankfurter, J., dissenting].) Janet G. came to the New York Foundling Hospital not as a beggar, for ours is a society profoundly committed to the concept of aid to needy children and families as an entitlement. (See Goldberg v Kelly, 397 US 254.) Hopefully, the Dickensian portrait of mothers driven to leave babes in doorways belongs to the dark recesses of the past. Even in days far less sensitive to the plight of the individual, an English Judge observed that "necessitous men are not, truly speaking, free men, but, to answer a present exigency, will submit to any terms that the crafty may impose upon them.” (Vernon v Bethell [1762], 2 Eden 110, 113.)
Printed form agreements involving waiver of rights have been the subject of Supreme Court scrutiny even when a commercial contract between private parties is involved, the signatory is an adult and the subject of the contract is a property interest, e.g., the sale of a stove, etc. (See Fuentes v Shevin, 407 US 67.)
"In the civil area, the Court has said that '[w]e do not presume acquiescence in the loss of fundamental rights,’ [citations]. Indeed, in the civil no less than the criminal area, 'courts indulge every reasonable presumption against waiver’.” (Fuentes v Shevin, surpa, p 94, n 31.)
Waiver is suspect, and the courts are zealous in their concern with "the involuntariness or unintelligence of a waiver” even in those cases involving only property interests. (Fuentes v Shevin, supra, p 95.) In this area of "instructive analogy”, to use Mr. Justice Brennan’s phrase in Carey v Population Servs. Int. (supra, p 688), the Supreme Court has articulated the particular "considerations relevant to determination of a contractual waiver of due process rights * * * where the contract is one of adhesion, where there is great *144 disparity in bargaining power, and where the debtor receives nothing for the [waiver] provision;”. (Fuentes v Shevin, supra, pp 94-95; Overmyer Co. v Frick Co., 405 US 174, 188.) A fortiori, where the agreement surrenders parental rights to the State, where the agreement is between the State and a minor, where the minor is not aware or made aware of the legal significance of the provisions, where the minor does not know that she need not sign the papers presented to her, where the instrument is a maze of fine print, complex, technical provisions.
Manifestly, the instant surrender agreement is a testimonial to legal handiwork effectuating the State’s parens patriae responsibility to the baby who is the subject of the document. New York State policy, as embodied in sections 383 and 384 of the Social Services Law, affords supreme consideration to the interests of that child. Such primacy of concern serves a legitimate and commendable State purpose. In the aftermath of People ex rel. Scarpetta v Spence-Chapin Adoption Serv. (28 NY2d 185), the Legislature prescribed substantial limitations to the earlier rights of parents as parties to a surrender instrument and authorized concomitantly restrictive conditions as terms of the agreement. That the intent of the printed form agreement is to vindicate the interest of the baby necessarily means the converse for the parent: an instrument fraught with legal technicalities and terminology adverse to parental rights.
Vindication by the State of its interest in the baby, defined by section 384 of the Social Services Law as a "child under the age of eighteen years”, does not, however, relieve the State of its parens patriae obligation to the parent who is also under the age of 18. Of critical significance, at the stage that the State and the parent assume the positions of "contracting” parties, they become antagonists, and a conflict arises between the State’s parens patriae role toward the baby and its parens patriae responsibility to the minor-parent. Although the parens patriae concept has been characterized as murky in meaning and dubious in historic credentials (Matter of Gault, 387 US 1, 16, supra), the unequivocal essence of the responsibility to the minor is the moral imperative of the fiduciary. In the realm of commerce, the standard of conduct demanded of a fiduciary is absolute: "the punctilio of an honor the most sensitive * * *' Uncompromising rigidity has been the attitude of courts of equity when petitioned to undermine the rule of *145 undivided loyalty by the 'disintegrating erosion’ of particular exceptions [citation]. Only thus has the level of conduct for fiduciaries been kept at a level higher than that trodden by the crowd.” (Meinhard v Salmon, 249 NY 458, 464 [Cardozo, JJ.)
Does this standard lose its vigor when the fiduciary is the State dealing with a minor and the subject of trust is not property but the minor’s constitutional rights regarding her child?
Due process makes the answer self-evident. To sustain the CSS’s claim of contractual right to Jennifer would render due process meaningless verbiage. Constitutional not contract principles go to the heart of the matter, and the State may not evade fundamental tenets by acting in the form and language of a contractual transaction. The parens patriae obligation imposes an affirmative moral duty upon the State in its dealings with minors. The State must provide safeguards to ensure that surrender by a minor is a voluntary, knowing and informed decision.
Assuming that the burden of proof lies with the parent who was a minor when the surrender was executed, Janet G. has sustained that burden and has proven clearly and convincingly that the agreement was not a voluntary, was not an informed and was not a knowing surrender under the circumstances. The surrender is hereby set aside as violative of due process and null and void.
The holding in this case does not declare any portion of New York statutory law unconstitutional. That does not mean the legislative design and enactments pertaining to surrender agreements involving minors who are parents are completely free from infirmity. Evolving conceptions in the constitutional sphere may render even recent legislation at best archaic. The patent flaws in the area of minors who are parents lie in explicit provisions limiting challenge to contract law bases and in the failure to prescribe procedures to safeguard a voluntary, informed and knowing surrender decision. Formulation of proper procedures appears "appropriate grist for the legislative mill.” (Swarb v Lennox, 405 US 191, 202.)
In his 1977 Holmes Lectures, The Common Law in an Age of Statutes, Professor Guido Calabresi explored the judicial role in lawmaking and proposed "his 'doctrine of the second look’ which he defined as the 'judicial power to change or nullify statutes in appropriate cases, without declaring the *146 statute unconstitutional, and thus without precluding a second look by the legislature.’ ” (28 Harv Law School Bull, No. 3, p 10.)
Judicial restraint in lawmaking should not bar dialogue with the legislative branch. In that spirit, some thoughts are offered:
The task of ensuring that surrender by a parent who is a minor is a voluntary, informed and knowing decision poses vexing problems. Absent a " 'significant state interest’ ” (Carey v Population Servs. Int., 431 US 678, 693, supra) protective measures may not infringe the individual minor’s autonomy in exercise of the constitutionally protected decision. (Planned Parenthood of Mo. v Danforth, 428 US 52, supra.)
To turn once again to the abortion decision: contrasted with the constitutionally impermissible parental or spousal consent requirements, the underlying premise of informed consent in the abortion decision is consultation with a physician. Indeed, the Supreme Court has itself clarified that position and its reasoning, stating, in Carey v Population Servs. Int. (supra, pp 699-700, n 25): "In cases involving abortions, we have emphasized that the decision to terminate a pregnancy is properly made by a woman in consultation with her physician * * * The reason, of course, is that the abortion decision necessarily involves a medical judgment”.
For reasons more fully elaborated above regarding the instant document, can it be seriously questioned that legal advice is a basic component of an informed surrender by agreement between the State and a parent who is a minor?
New York State has long recognized the constitutional right to counsel in a contest between the State and the parent for custody of a child because of the nature of the interest at stake. The Court of Appeals reasoned (Matter of Ella B., 30 NY2d 352, 357): " '[w]hether the proceeding be labelled "civil” or "criminal,” it is fundamentally unfair, and a denial of due process of law for the state to seek removal of the child from an indigent parent without according that parent the right to assistance of court-appointed and compensated counsel * * * Since the state is the adversary * * * there is a gross inherent imbalance of experience and expertise between the parties if the parents are not represented by counsel.’ ” The legislative response to the judicial mandate has resulted in explicit statutory provision for assignment of counsel to indigent parents in, amongst other actions, proceedings pursuant to *147 section 384 of the Social Services Law, the section involved herein. (Family Ct Act, §§ 261, 262.) Significantly, section 384 of the Social Services Law envisages not only a proceeding to challenge a surrender agreement but also a proceeding for approval of a surrender agreement, the latter at the discretion of the State or authorized agency.
Agreement between the State and a minor is a method of surrender that may be prescribed by the Legislature in the interest of the baby. Manifestly, the nature of the interests is unaffected by the form of the procedure. No less than as formal contestants, at the agreement stage, the interests of the State and the minor-parent diverge. But, the State’s obligation to the minor to safeguard a voluntary, informed and knowing decision remains. Fulfillment of the State’s duty to the minor can be achieved by the right that is a distinguishing hallmark of our legal system: the right to appointed independent counsel for the minor, e.g., the Legislature may create an Office of Legal Ombudsman for Minors.
If " '[men must turn square corners when they deal with the Government,’ ” (Federal Crop Ins. Corp. v Merrill, 332 US 380, 385) so the State must turn square corners when it deals with minors.
Settle order on five days’ notice.[4]
I, JANET —, residing in the Borough of —, County of —, City and State of New York, do hereby declare and state that I am the mother and have the sole legal custody of the male/female child JENNIFER — born at —, Borough of —, County of —, City and State of New York, on the 14th day of June, 1977, under the name of "FEMALE” —: that I am unmarried; that I have never been married.
That after due consideration, I have come to the conclusion that I am unable and will never be able to care for my child in his/her own home and that the best interests of my child will be promoted by a permanent transfer of his/her legal custody and guardianship to the Commissioner of Social Services of the City of New York, and also by his/her placement in a foster home for adoption.
That accordingly, I do hereby, pursuant to the provisions of Section 384 of the Social Services Law, transfer legal custody and commit the guardianship of my child to the said Commissioner of Social Services of the City of New York; and I do further specifically consent and agree that, if my child be found to be in need of any surgical *148 or medical treatment whatsoever, the said Commissioner or his designee may authorize and consent to such treatment without any notice to me or to anyone else; and I do further specifically consent and agree that, if my child shall be placed by said Commissioner with an authorized agency, the said agency may authorize and consent to such surgical or medical treatment without notice to me or anyone else.
That I do hereby further voluntarily and unconditionally surrender my child to the Commissioner of Social Services of the City of New York, a duly authorized agency as defined in Article VI of the Social Services Law, for the purpose of placing him/her in a foster home for adoption, and hereby expressly empower and authorize said Commissioner or his designee to consent to the adoption of my said child above named with the same force and effect as though I consented myself, without further notice to me; and I do hereby further expressly empower and authorize the said Commissioner, in his discretion to transfer the custody of my child for placement for adoption to an authorized agency as defined in Article VII of the Domestic Relations Law of the State of New York, and I hereby expressly grant full power to such authorized agency to consent to the adoption of my child above named with the same force and effect as though I consented myself, without further notice to me. I understand that, by surrendering said child to an authorized agency, I relinquish all of my personal rights to my child. I expressly pledge not to interfere hereafter with the care or management of said child in any way.
Form M-984h p. 1 (Mire atrés)
Rev. 11/21/75
I have been informed and understand that:
1. Pursuant to the provisions of Section 384(5) of the Social Services Law, once having executed • this instrument of surrender, no action or proceeding may be maintained by me for the custody of my surrendered child or to revoke or annul such surrender, once the child has been placed in the home of adoptive parents and more than thirty days have elapsed since execution of the surrender, or where the purpose of such action or proceeding is to return the child to or vest the child’s custody in any person other than myself. That the foregoing prohibition, however, will not bar actions or proceedings brought on the ground of fraud, duress or coercion in the execution or inducement of this surrender.
2. Pursuant to the provisions of Section 358-a of the Social Services Law, a proceeding will be initiated in the Family Court to obtain Court approval of this instrument and the transfer of the custody and guardianship of the said child to the Commissioner of Social Services of the City of New York. In connection with such proceedings, I do hereby consent to the jurisdiction of the Family Court over such proceedings.
3. I waive notice of any such proceeding and service of the petition on me as well as a hearing thereon. I consent that the Family Court Judge’s determination be made based solely upon the petition and other papers, if any, that are submitted to the Court, and to the entry of an order approving this instrument and the transfer of custody and guardianship of the child to the Commissioner of Social Services of the City of New York based upon such determination.
Signature of Mother
Witness: _______
New York Foundling Hospital - 879-2200
*149 NOTICE:
If notarized outside of New York State, certificate of authentication or county clerk’s certificate, including statement that acknowledging officer is authorized to take the acknowledgement, must be attached to original.
Form M-984h p. 3 Rev. 11/21/75
STATE OF NEW YORK, COUNTY OF NEW YORK ss.:
On the 12th day of August, 1977, before me personally came JANET-, to me known to be the individual described in and who executed the foregoing instrument, and she duly acknowledged that she executed the same.
Notary Public or Commissioner of Deeds (Mire atrés)

. The term "surrender,” as used herein is statutory in origin. Section 384 of the Social Services Law provides, in pertinent part, "The guardianship of the person and the custody of a destitute or dependent child under the age of eighteen years may be committed to an authorized agency by a written instrument which shall be known as a surrender”.

. October 12, 1977.

. The document executed by the Anonymouses on June 20, 1977 provides: "We the undersigned, understand that.we are taking Jennifer G., born June 14, 1977, on a boarding basis. We understand that we are acting in the capacity of a foster home until such time that Jennifer G. becomes legally free for adoption. If for some reason this does not occur, we will cooperte with whatever plan the New York Foundling Hospital makes for this child.”

. Upon agreement amongst the parties, reached February 22, 1978, no further issues remain before the court for judicial resolution. The CSS and NYFH have requested a 10-day period to evaluate the matter. The issue of custody may be rendered moot. A conference with the attorneys has been scheduled for March 2, 1978, and leave has been granted to take such action as deemed advisable.