THE DEPARTMENT OF PUBLIC AID *ex rel.* MARGARET McFARLAND, Plaintiff-Appellee, v. LAWRENCE G. THOMPSEN, Defendant-Appellant.

Second District   No. 2—90—1302

Opinion filed September 16, 1991.

William J. Scott, Jr., of Mirabella & Kincaid, of Wheaton, for appellant.

Roland W. Burris, Attorney General, of Springfield (Rosalyn B. Kaplan, Solicitor General, and Eve Moran, Assistant Attorney General, of Chicago, of counsel), for appellee.

JUSTICE GEIGER delivered the opinion of the court:

The defendant, Lawrence G. Thompsen, appeals from a circuit court judgment that, pursuant to the Illinois Parentage Act of 1984 (the Act) (Ill. Rev. Stat. 1989, ch. 40, par. 2501 *et seq.*), declared him to be the father of Sean McFarland, the child of the relator, Margaret McFarland, and ordered him to pay both retroactive and prospective child support. On appeal, the defendant argues that (1) the trial court violated his constitutional right to choose not to procreate when it required him to support a child born only because the relator deceived

him into thinking that she could not become pregnant; and (2) the trial court lacked authority to order child support retroactive to the date of Sean's birth. We affirm.

On December 23, 1988, the Department of Public Aid (Department), on behalf of the relator, filed a "Petition for Determination of a Father/Child Relationship," alleging that the defendant was the father of the relator's child, Sean Michael McFarland, who was born January 22, 1985, and was in the custody of the relator. The petition prayed that the court enter judgment establishing the existence of a father and child relationship between the defendant and Sean and award the relator temporary and permanent child support from April 1984.

The defendant initially denied the allegations of the petition. On August 16, 1988, however, after numerous continuances, the court entered an order based on an agreement amongst the Department, the relator, and the defendant. The order stated that the defendant, upon his admission in open court, was adjudged to be Sean's father and that the relator was adjudged to be fit and proper to have the sole care, custody, and control of Sean. The order stated that the questions of visitation and support were reserved.

On October 18, 1989, the Department filed what it called a "Petition to Intervene and Set Support." The petition prayed, *inter alia*, that the Department be allowed to intervene for the purposes of establishing support and enforcing the resulting order for support and that the defendant be ordered to pay child support and to purchase or maintain health insurance coverage on Sean's behalf.

The defendant moved to dismiss the "Petition to Intervene and Set Support," and the Department moved to strike the motion to dismiss. The trial court denied both motions and set the matter for hearing. After more continuances, the court heard the matter on October 19, 1990. We summarize only the relevant testimony from the hearing.

By agreement of the parties, the defendant first called his brother, Robert Jensen, to testify. Jensen had met the relator years before when she and his brother were dating. During or shortly after April 1984, Jensen, who resided in Michigan, received a telephone call from the relator. She told Jensen that she was pregnant and that the defendant knew nothing about it. She told Jensen that she planned to move in with her mother, who would help her bring up the child. She told Jensen she wanted the defendant to have "nothing to do with it," and that she did not want the defendant to be "liable in any

way." She did not explain what she meant by "liable," but Jensen took her to refer to liability for child support.

The Department proceeded with its case, first calling the defendant as an adverse witness. The defendant testified that he was 44 years old and had been a licensed pharmacist since 1970. He had known the relator since 1980. He had not yet paid any support for Sean because the court had not yet required him to do so.

The relator testified that she was 43 years old, single, and had been working as a school nurse for four years. From 1975 through February 1986, she had been employed as a nurse at Rush-Presbyterian-St. Luke's Hospital. Her relationship with the defendant lasted about two years.

In July 1984, the relator telephoned Robert Jensen. She told Jensen that she was pregnant, that the defendant was the father, and that Jensen might try to get the defendant to "become a little more involved." The relator did not recall discussing child support or other financial matters with Jensen. She testified that she did not tell Jensen that the defendant did not know she was pregnant, since she had informed the defendant by telephone of her pregnancy in May 1984.

The relator acknowledged that at the time Sean was conceived she had endometriosis and was taking Danocrine, a prescription drug, for this condition. She took Danocrine from about December 1983 through March 1984. The defendant knew about this because he was filling her prescriptions. She did not ask the defendant to keep filling her prescriptions beyond March 1984, but could not remember whether, before she discovered that she was pregnant, she told the defendant that she had stopped taking Danocrine.

The relator testified that she did not know the side effects of Danocrine. She admitted that shortly before Sean was conceived her doctor had told her that her "biological clock" was running. Before she started taking Danocrine, she had undergone a laparoscopy and a D and C procedure. Although these operations could have made pregnancy more likely, the reason she had the surgery was as treatment for her endometriosis. She testified she was not trying to become pregnant, but she was not completely against it; if it happened, it happened. The relator and the defendant talked a few times about having children. On these occasions, the defendant said that he did not want children. The relator could not recall if any of these discussions took place in 1984.

The defendant testified in his own behalf. He stated that the last time he filled a Danocrine prescription for the relator was two or three weeks before Robert Jensen called him in May 1984 to tell him

that the relator was pregnant. The defendant replied that was impossible because she was taking Danocrine, a leading side effect of which was the inability to become pregnant. This call was the first the defendant heard about the relator's pregnancy.

After receiving another call on the same subject from his brother, Donald Thompsen, the defendant met with the relator at her house. He asked her how she could have gotten pregnant; she replied that she had stopped taking Danocrine. He asked her why she did not at least talk with him about the matter beforehand; she replied that she knew from their past discussions that he would not want to become involved. The defendant told the relator that she at least could have informed him that she was no longer taking a drug that she had been using as a contraceptive. She assured him that it was a decision she had made on her own and that it was no accident. She thought her pregnancy was "wonderful."

The defendant testified further that the relator assured him that she would not ask him to support the child that he had unwittingly fathered. She would keep her job and live with her mother, who would help care for the baby. The defendant testified further that he signed the August 16, 1988, consent order because he understood the order to mean that if he had no contact with Sean, the relator would not make him support the child.

The defendant stated that he and the relator had on several occasions discussed having children. He did not want children, and she knew it. Had he known that she had stopped taking Danocrine, at the very least he would have discussed with her whether they wanted to continue their sexual relationship and what steps they might have taken to make sure that she did not become pregnant.

Donald Thompsen, the defendant's brother, testified that he visited the relator in the spring of 1984 on business. She told him then that she was pregnant with the defendant's child and that the defendant did not know it. She explained that her biological clock was running out; if she did not have a baby soon, she might never be able to have one.

At this point in the hearing, counsel for the Department objected and asked that Donald Thompsen's testimony be stricken on the ground that it was irrelevant because "there is [no] entrapment defense in a paternity action." The defendant's attorney argued that the relator's conduct and attitude were relevant to whether the defendant was obligated to support the child or, at least, the amount of his obligation. The trial judge disagreed, explaining that under the Act every child is entitled to both parents' support. The defendant then made an

offer of proof in which Donald Thompsen testified that the relator had told him that she had not told the defendant about her plan to become pregnant because she knew that he would not agree. She also said that since this was her decision, she would take full responsibility and did not want anything from the defendant.

By an order entered October 19, 1990, the trial court held that the defendant owed a duty of financial support to Sean. The court set the obligation at $75 per week from January 22, 1985, Sean's date of birth, through January 22, 1990; $90 per week from January 22, 1990, through January 22, 1998; and $120 per week from January 22, 1998, until Sean turned 18. The court also ordered the defendant to obtain group medical insurance for Sean. The order stated finally that the case was continued to November 6, 1990, "for setting of amount and payment plan on arrearage."

The defendant filed his notice of appeal from the October 19, 1990, order the next day. On November 13, 1990, the court entered an order stating that pursuant to the October 19, 1990, order, the defendant owed back support in the sum of $23,355. On November 27, 1990, the court entered an order of withholding, pursuant to section 19 of the Act (Ill. Rev. Stat. 1989, ch. 40, par. 2519) against any payor of the defendant.

■ In our consideration of the defendant's appeal, we can quickly dispose of the issues he raises. The defendant argues first that because he was (as he sees it) tricked into fathering a child that he did not want, the State violated his constitutional right of procreative choice by requiring him to support that child. The defendant argues that the Act as applied is therefore unconstitutional. We find his argument totally without merit. The defendant attempts to analogize this case to two United States Supreme Court cases invalidating State restrictions on the distribution of contraceptives. (See *Carey v. Population Services International* (1977), 431 U.S. 678, 52 L. Ed. 2d 675, 97 S. Ct. 2010; *Eisenstadt v. Baird* (1972), 405 U.S. 438, 31 L. Ed. 2d 349, 92 S. Ct. 1029.) Here, however, the State has not limited the defendant's (or anyone's) access to contraception, but simply has required that the defendant who fathered a child contribute to the support of that child. The defendant can point us to no authority requiring us to hold that a child must be deprived of the support of one of his parents because of that parent's misapprehension of the likelihood of conception. We find that the constitutional right claimed by the defendant, which would require such discrimination against an innocent minor, does not exist.

██ The defendant next argues that the Act does not allow the retroactive payments of child support ordered in this case. The defendant never raised this argument at the trial level and has therefore waived it on appeal. In any event, section 14(b) of the Act plainly states that the court may order child support payments to be made "for a period prior to the commencement of the action" (Ill. Rev. Stat. 1989, ch. 40, par. 2514(b)). This language means what it says. (*Milligan v. Cange* (1990), 200 Ill. App. 3d 284, 293; *In re Paternity of Hubbard* (1989), 186 Ill. App. 3d 234, 236-37.) The trial court therefore did not err in ordering retroactive support payments.

The judgment of the circuit court of Du Page County is affirmed.

Affirmed.

WOODWARD and INGLIS, JJ., concur.