Matter of Bobbijean P. (2004 NY Slip Op 50286(U))

[*1]

Matter of Bobbijean P.

2004 NY Slip Op 50286(U)

Decided on March 31, 2004

Family Court, Monroe County

Published by New York State Law Reporting Bureau pursuant to Judiciary Law § 431.

This opinion is uncorrected and will not be published in the printed Official Reports.

Decided on March 31, 2004

Family Court, Monroe County
In the Matter of BOBBIJEAN P., 
 A Child under the Age of Eighteen Years Alleged to be Neglected by STEPHANIE P. AND RODNEY E., Respondents.
Docket No. NN 03626-03

PETER A. ESSLEY, ESQ., Monroe County Department of Human and Health Services
EFTIHIA BOURTIS, ESQ., Law Guardian

MARILYN L. O'CONNOR, J.
On March 31, 2003 the Monroe County Department of Human and Health Services ("DHHS") filed this petition for an order determining Bobbijean P., born only days before on March 23, 2003, to be a neglected child (Article 10 of the Family Court Act). Before the petition had been filed, the baby girl had been taken from the respondents on an emergency basis. Bobbijean is the fourth child of the respondent mother to be the subject of neglect proceedings brought against the mother. All four of her children are currently in foster care, and for the reasons set forth below the respondent mother is hereby found to have neglected Bobbijean. The mother's other neglected children are Rodney E. Jr., age 1 (born 5/2/02); James R., age 4 (born 6/6/99), and Schafus R. III, age 5 (born 5/2/98). Because of a pattern of neglectful behavior exhibited by respondent mother, this court is taking the unusual step of ordering respondent mother not to get pregnant again as a condition of the disposition plan, effective upon service of a copy of this decision and order, and so long as the order is in effect.
The respondent father has also had at least one prior neglect proceeding brought against him, regarding Rodney E., Jr. (born 5/2/02). For the reasons set forth below the respondent father is hereby found to have neglected Bobbijean. Because he has fathered two neglected children in less than one year with respondent Stephanie P., and because he never even bothered to appear in court or make any effort with respect to Bobbijean's welfare, this court will also order him not to father more children as a condition of the dispositional plan, effective upon service of a copy of this decision and order, and so long as the order is in effect.
After obtaining personal jurisdiction over the parents, at the first appearance this court ordered the baby placed in the care and custody of the Department. The respondent mother made only one court appearance. At that appearance she waived her right to counsel, named a relative with whom she would like her new baby to live, and explained that the respondent father lives with her but was not present due to his work schedule. The matter was scheduled for trial, and the matter proceeded by default against both respondents on the trial date.
At the trial, the only witness was Susan Burke, DHHS caseworker. She had worked with the mother for seven months. Her testimony was credible. The court took judicial notice of prior orders involving both respondents in this case, both parents in one other neglect case, and just the [*2]mother in still another neglect case.[FN1] Caseworker Burke testified that once assigned to this case, she immediately went to work. At that time there was a high level of concern because the mother had a prior history of "cocaine babies", and there were reports about continued cocaine use. Burke said she received a Child Protective Service ("CPS") referral concerning the baby the day after she was born. That referral, called a "Child Protective Services Intake Report", was received in evidence. The allegations were categorized as "Inadequate Guardianship" and "Parent's Drug/Alcohol Misuse". The allegations of the referral were that the mother and infant had tested positive for cocaine at the hospital, and that the mother does not appear to be prepared for the infant. The referral noted that the mother "has other children in Foster Care [sic]." Burke testified that she investigated the referral, which had been made by a mandated reporter.
Burke described the case history as one of repeated and ongoing substance abuse, usually cocaine, with three of four babies having tested positive for cocaine. There was no test for cocaine done on the fourth child, and thus it was not known whether that baby would have had a positive screen. At the time of the hearing all three older siblings were in foster care with a relative resource. Bobbijean was also in foster care. Burke had conducted her investigation both through Highland Hospital, where the child was born, and Strong Memorial Hospital, where the mother had been seen for limited prenatal care. The caseworker had communicated extensively with Audrey Grapp, who had been involved with the birth and discharge of the baby. Burke testified that the mother had been referred to substance abuse treatment numerous times, and "in the past she may have made attempts [at treatment] but never followed through, but more recently over the last couple years, there were no attempts at all to re-engage." Thus, the mother's behavior was deteriorating. Burke testified further that both respondents were present the morning she went to remove the baby, and that both admitted that they needed to get substance abuse help in order to take care of this baby. They also admitted that they did not have a place to go with the baby and stated they wanted the baby placed with Blanche J., the relative resource for the mother's other three children. The respondents were residing at the time of this birth at the House of Mercy, a homeless shelter where people off the streets live daily i.e., people without jobs and often with substance abuse and significant financial issues.
Significantly, Burke testified that since the removal of the baby, neither parent had contacted her to indicate readiness to take care of the child and neither had followed up at all regarding the baby. Burke was concerned about the mental health and parenting skills of the parents. She stated, "All of those needs that were part of the original court orders for the other children had not been met as well." This includes "engage in substance abuse treatment . . . and follow all recommendations, including a new evaluation if needed."[FN2] Specifically, Burke added that though ordered to get mental health treatment and attend parenting classes, respondents did not do so. She also confirmed the allegations of the petition, based on department records and [*3]her personal knowledge.
The Department's evidence was completely unrebutted due to the absence of the respondents. The court finds that the respondents had not engaged in any services from May 2002 until the time of the petition. Also, the court finds that both parents had failed to be present for three scheduled meetings with the Department set up to discuss plans for the baby; that the mother, Stephanie P., also neglected her responsibilities as a mother by causing the baby to be born testing positive for cocaine at a time she herself also tested positive for cocaine; and that respondent mother had tested positively for cocaine several times during her pregnancy. A newborn infant's positive toxicology test for cocaine without more will not sustain a neglect finding, but an additional finding, such as imminent danger due to mother's drug usage history, will provide an adequate basis. Nassau County DSS ex rel Dante M. v Denise J., 87 NY2d 73; In re Theresa J., 158 AD2d 364; Nassau County DSS v Laquetta H, 191 AD2d 567; In re Stefanel Tyesha C, 157 AD2d 322, app gr 164 AD2d 852, later proceeding 559 NYs2d 813, app dismd 76 NY 1006, mot den 77 NY2d 866; Mark S. v Felicia B., 144 Misc2d 169.[FN3] A father's drug usage prior to a child's birth can contribute to a finding of neglect against him In re Heidi S., 151 AD2d 578. The court finds that both parents had continuing drug use problems. As stated in one Risk Assessment and Service Plan from the neglect case involving the parties' other child together, Rodney E., Jr., these respondents "make using drugs a priority over the welfare of their children".[FN4] Accordingly, the clear and convincing evidence is that the respondents have neglected their new baby Bobbijean P., so that her physical condition is in imminent danger of becoming impaired (FCA § 1012[f][1]) by their history of drug usage, their failure to get substance abuse and mental health treatment as previously ordered, by their failure to have suitable housing for her, and by the failure to plan for the baby and have baby supplies (cf., e.g., Busch v Margaret B, 109 AD2d 8387; In re Shane O, 147 AD2d 733).
The Department asked that the court adopt the proposed Dispositional Plan. That plan, as revised by the Department to include both respondents, will be adopted, but with four additional ordering paragraphs. The first additional paragraph shall state that it is:

ORDERED that pursuant to Social Services Law, section 131-e, the Monroe County Division of Social Services shall advise respondents periodically of the availability at public expense of family planning services for the prevention of pregnancy and inquire whether the respondents desire to have such services furnished to them, and when such services are desired, shall promptly make such services available to respondents at public expense.
The second additional ordering paragraph shall state that it is:

ORDERED that respondents make themselves available for the periodic family planning [*4]advice to be given by the Monroe County Division of Social Services.
Regarding the third and fourth additional conditions, it is the intention of the court that the mother be required to not get pregnant until all of her children are being raised by a natural parent, or are no longer being cared for at the expense of the public. It is similarly the intention of the court that the father be required to not father another child until all his children are being raised by a natural parent, or are no longer being cared for at the expense of the public. It is further the intention of the court that neither parent shall conceive another child until found capable of having custody of all their current children. In other words, the respondents shall be required to act like responsible parents and for the duration of the order, to have no more children unless they can parent them themselves. Thus, the third and fourth additional ordering paragraphs shall state:

ORDERED that effective upon the date of personal service of a copy of this order upon respondent Stephanie P. and so long as this order or an extension of it is in effect, the respondent Stephanie P. shall not get pregnant again until and unless she has actually obtained custody and care of Bobbijean P. and every other child of hers who is in foster care and has not been adopted or institutionalized; and it is further
ORDERED that effective upon the date of service of a copy of this order upon respondent Rodney E. Sr. and so long as this order or an extension of it is in effect, the respondent Rodney E. Sr. shall not father any other child or children until and unless he has actually obtained custody and care of Bobbijean P. and every other child of his who is in foster care and has not been adopted or institutionalized or had custody granted to another party; . . .
The court of course recognizes that requiring a mother not to get pregnant and a father not to father any other children is an unusual ordering provision.[FN5] The court has found only one [*5]published case in which getting family planning education was an express condition of the dispositional plan (Matter of Guardianship of Jones v Cardinal McCloskey Children's and Family Services, 121 AD2d 318). In that case, the First Department reversed and remanded, writing of facts similar to those in the case at bar:
The court [below] also found it not proven that respondent was in need of referrals to either a family planning or parental skills program. However, we think it clear that respondent needed some family planing education if only by virtue of her having four children in as many years, and her having given up two for adoption and Marlon for foster care when he was only two weeks old. The identity of Marlon's father was unknown.
As with Jones, the facts of this case and the reality of parenthood cry out for family planning education. However, this court has gone one step further, by adding the practical condition prohibiting the respondents from conceiving more children.
It is painfully obvious that a parent who has already lost to foster care all 4 of her children born over a 6-year period, with the last one having been taken from her even before she could leave the hospital, should not get pregnant again soon, if ever. She should not have yet another child which must be cared for at public expense before she has proven herself able to care for other children. The same is true for the father and his children. As to both parents, providing care for the children includes providing financial support. This is a practical, social, economic and moral reality. In effect, Bobbijean was born to a "no-parent family". She is for all practical purposes motherless and fatherless. This is not acceptable.
All babies deserve more than to be born to parents who have proven they cannot possibly raise or parent a child. This neglected existence is an immense burden to place on a child and on society. The cycle of neglect often created by such births needs to stop. Our society has reached the breaking point with respect to raising neglected children, often born with extraordinary needs. One only need look at our schools, our jails, our Division of Human and Health Services budgets, and our Family Courts to see that a serious change of direction is necessary in the interests of children, the taxpayers, and the community as a whole.
 Some may argue that having unlimited children is a constitutional right protected by the very same constitutional right of privacy that protects the right to practice birth control (Griswold v Connecticut, 381 US 479), a woman's right to an abortion (Roe v Wade, 410 US 113, supra), and a homosexual's right to engage in consensual sex with another homosexual (Lawrence v Texas, 123 S. Ct. 2472; 156 L. Ed. 2d 508; 2003 U.S. LEXIS 5013). This court notes, however, that the language of the United States Supreme Court, in Stanley v Illinois (405 US 645, 651), implies otherwise. This case, regarding the constitutional rights of an unwed father to his children, does not say that the right to conceive a child is essential, but the rights to conceive and to raise one's children have been deemed "essential". The U.S. Supreme court wrote, in its most relevant part,
The Court has frequently emphasized the importance of the family. The rights to conceive and to raise one's children have been deemed "essential," Meyer v. Nebraska, 262 U.S. 390, 399 [*6](1923), "basic civil rights of man," Skinner v. Oklahoma, 316 U.S. 535, 541 (1942), and "rights far more precious . . . than property rights," May v. Anderson, 345 U.S. 528, 533 (1953). "It is cardinal with us that the custody, care and nurture of the child reside first in the parents, whose primary function and freedom include preparation for obligations the state can neither supply nor hinder." Prince v. Massachusetts, 321 U.S. 158, 166 (1944). The integrity of the family unit has found protection in the Due Process Clause of the Fourteenth Amendment, Meyer v. Nebraska, supra, at 399, the Equal Protection Clause of the Fourteenth Amendment, Skinner v. Oklahoma, supra, at 541, and the Ninth Amendment, Griswold v. Connecticut, 381 U.S. 479, 496 (1965) (Goldberg, J., concurring).
To use the language of the United States Supreme Court, there is absolutely nothing precious about giving birth to repeated children, only to immediately require friends, relatives, or strangers, as well as society as a whole, to raise those children at its expense. The court must balance individual privacy rights with the state's overriding interest in protecting children and limiting the financial and societal burden created by caring for neglected children. Parents who have more children when there has already been clear and convincing proof that those parents could not raise any children they now have, and that any new children, if not removed would be victims of neglect and/or abuse. Any constitutional right to parent under these circumstances is outweighed by society's right to not have the additional physical and financial burden of providing for that child.
The recent foster care budget for Monroe County was $32 million a shockingly large number. In 2001, the latest year for which numbers were available, the average cost per year for a child in "DSS Family care"[FN6] was $22,931 per year, for a child with "purchased family care"[FN7] was $27,753 per year, and for a child in "residential care"[FN8] was $84,013 per year, including $24,900 for tuition and $51,220 for care and board. The foster family care board rates for children range from $12.29 per day, for regular board for children ages 5 and under, to $37.37 per day, for children ages 12-20 with exceptional needs. The care giver for any child placed on an emergency basis is paid $26.65 per day for the first sixty days, plus $125 per month for being available on a 24-hour basis for such emergency and after-hour placements. In addition to per diem costs associated with each child in foster care, there are a great variety of costly special [*7]allowances.[FN9] Children with HIV positive tests and AIDS qualify for the highest levels of per diem payments $34.34, $35.35 or $37.37 per day, depending on age. Cocaine addicted children, if they have symptoms, qualify for the middle range of board rates, $20.21 per diem to $31.60 per diem. Additionally, Medicaid covers medical expenditures at public expense.[FN10] Finally, the community must absorb the entire costs of educating each foster care child many of whom have special needs and thus cost far more to educate than children without special needs.[FN11]
It is important to note that the court is not directing what steps the mother should take in order to not get pregnant, or what steps the father should take in order to not get any woman pregnant. Practices are available to avoid or prevent pregnancies consistent with personal and even relgious beliefs. There are a great variety of birth control methods available,[FN12] and very significantly, the Department by law must provide the respondents with family planning information and services, for free, if desired. (Social Services Law, § 131-e.)
Social Services Law, § 131-e, captioned "Family planning services", was made effective in 1971 but apparently ignored until late 2002 in Monroe County, when a contract to provide the services it requires was supposedly put in place. Section 131-e states, in very practical language:
Each social services commissioner shall require that appropriate members of his staff personally advise eligible needy persons periodically of the availability at public expense of family planning services for the prevention of pregnancy and inquire whether such persons desire to have such services furnished to them. In those cases where such services are desired, they shall be made available at public expense under appropriate [*8]provisions of this chapter. Nothing herein shall be construed, however, to require or permit coercion of such persons to request or receive family planning services. [FN13]
The respondents may even choose to be sterilized the ultimate birth control method used by many adults once they have had all the children they wish to have. Such a procedure would be performed at no cost to the respondents, pursuant to section 131-e of the Social Services Law. Ferro v Lavine (1974, 3d Dept) 46 App Div 2d 313, 362 NYS2d 591; Clink v Lavine (1974) 79 Misc 2d 421, 359 NYS2d 1018.
It is important to note that the court is also not saying that if the mother gets pregnant, she should get an abortion. Of course, the respondent mother, like every other woman in this country, has a constitutional right to have an abortion based on the right to privacy without regard to any neglect cases against her (Roe v Wade, 410 US 113). At this time the court is simply recognizing that the best way for the respondents to become capable parents for their newest baby, Bobbijean, as well as for their other children, is to concentrate on the things necessary to make them adequate parents and not to make being a parent harder by having more children. 
This court believes the constitutional right to have children is overcome when society must bear the financial and everyday actual burden of care. Constitutional rights provide protection of basic rights but there is no basic right to be protected when the potential "right to have a child" would equal the right to neglect a child and commit a crime against that child, or force others to raise it, both physically and at public expense.
 In this case, the permanency goal of return to parent is approved, but this task of enabling these respondents to become adequate parents is a very hard one. By this decision and order, the parents are being directed not to make the task harder for themselves and more expensive for taxpayers, by conceiving more children.[FN14] The generosity and kindness of society has been abused enough,[FN15] the respondents's existing children have been neglected enough, and this court will do what it can in this particular case to end this pattern of behavior.
DATED: March , 2004
HON. MARILYN L. O'CONNOR,
[*9]
FAMILY COURT JUDGE
NOTICE: Pursuant to section 1113 of the Family Court Act, an appeal must be taken within thirty days of receipt of the order by appellant in court, thirty-five days from the mailing of the order to the appellant by the clerk of the court, or thirty days after service by a party or law guardian upon the appellant, whichever is earliest.
MAILED: Respondents, Peter Essley, Esq., Eftihia Bourtis, Esq.
Decision Date: March 31, 2004
Footnotes

Footnote 1: There was a finding of neglect against both respondents with respect to the child Rodney E., Jr., made August 8, 2002 (NN 277-02). There was a finding of neglect against respondent Stephanie P. with respect to the children Schafus R. III and James R., made in 2000 and extended on June 19, 2003(NN 331/332-99).

Footnote 2: Order of Extension from June 20, 2002 (signed Nov. 6, 2002).

Footnote 3: A defendant who smokes cocaine during her pregnancy cannot be prosecuted for endangering the welfare of a child born prematurely with cocaine in her blood stream since child as used in Penal Law, section 260.10, does not include fetus or unborn child. People v Morabito, 151 Misc2d 259.

Footnote 4: See attachments to petition in NN 00277-02/03A.

Footnote 5: Contraception, once out of favor, is now a protected practice, used by over 64 percent of American women according to the Centers for Disease Control and prevention (Democrat & Chronicle, Sept. 13, 2002, p 1B). In 1918, People v Sanger, 222 NY 192, error dismd 251 US 537, held that a provision of the New York State Education Law which made it a misdemeanor to sell, advertise or give information for prevention of conception did not violate the constitution. However, in1975, in Population Services International v Wilson, 398 FSupp 321, affd 431 US 678, a statute prohibiting contraception advertising was found overly broad and unconstitutional, where it operated to prohibit dissemination of information relating to intimate phases of sexual life protected by the right of privacy and to such matters of public interest as birth control, contraception and population growth. In Carey v Population Services International, 431 US 678, section 6811(8) of the New York State Education Law, which then prohibited the distribution of non-medical contraceptives to persons over 15 except through licensed pharmacists, was found to violate the right of privacy under the Due Process Clause, since so limiting the distribution imposed a significant burden on the right of individuals to use contraceptives and did not serve any compelling state interest. 

Footnote 6: This means Department of Human and Health Services certified foster care homes (family settings). The Department of Human and Health Services was until recently known as the Department of Social Services ("DSS").

Footnote 7: This refers to small foster care programs through agencies under contract with the Department of Human and Health Services, including the Urban League, Berkshire, Hillside, Ibero, Catholic Family Center and Lifetime Assistance. The rates are higher than certified foster care homes because in addition to the normal foster care board rates, the Department also pays the agency administration rates for its work (setting up and maintaining the homes, working with the children, etc.).

Footnote 8: This refers to higher levels of care, including group homes and residential treatment centers, as opposed to foster family based settings.

Footnote 9: There are clothing allowances of $392 to $875 per child depending on age, upon entering foster care, plus another $152 to $287.50 per six-month period of foster care thereafter, depending on age. Other extra allowances include $45 per month for diapers (to age 4); mileage of 32.5 cents per mile for foster care parents providing certain transportation services for the foster children's needs; special attire allowances for such things as uniforms for sports, graduation caps and gowns and prom attire; up to $350 per year for activities, lessons and events; allowances for required school expenditures, school pictures and yearbooks; special allowances for non-medical needs of handi-capped children; window guards for small children; and compensation to foster parents for damage to property caused by foster children (up to $1000 per two years per child); plus two weeks per year of day camp or residential summer camp costs. 

Footnote 10: Information obtained from the Department of Human and Health Services, Division of Social Services, Cynthia W. Lewis, CSW, ACSW.

Footnote 11: Laws already enacted and recognizing a need to encourage healthy families through family planning and to avoid teenage pregnancy include Social Services Law, sections 350, 365-a, 372-a, 384-b, 409-a; 409-e, 409-i, 429, Article 8-A; Education Law, sections 612, 804-a, 804-b, 3641; Public Health Law, section 2522.

Footnote 12: For example, birth control pills, the patch, abstinence, Depoprevara shots which last for 3 months, Norplant implants that last for years, the sponge, vasectomy, and condoms are well-known methods of birth control.

Footnote 13: Whether this section of the law has been ignored throughout the rest of the state is unknown to this court. Only two cases cite it. 

Footnote 14: Social Services Law, section 131-a, provides that assistance to needy families increases with each additional person in the household and when a woman is medically verified to be four months pregnant. This additional cost per child in a household, however, is minuscule when compared to the cost of foster care.

Footnote 15: This court has seen as many as 9 children from one family surrendered to foster care. In that particular case the caseworker reported that the parents had the 9th child in the hope of raising that one child out of the entire group. In the Matter of Shanice J., NN89-97/01A (Monroe County Family Court).